ROSENBERG, DISTRICT DIRECTOR, IMMIGRA-
TION AND NATURALIZATION SERVICE, *v.*
FLEUTI.

No. 248.   Argued March 26, 1963.—
Decided June 17, 1963.

*Philip R. Monahan* argued the cause for petitioner. With him on the brief were *Solicitor General Cox, Assistant Attorney General Miller* and *Maurice A. Roberts*.

*Hiram W. Kwan* argued the cause and filed a brief for respondent.

MR. JUSTICE GOLDBERG delivered the opinion of the Court.

Respondent Fleuti is a Swiss national who was originally admitted to this country for permanent residence on October 9, 1952, and has been here continuously since except for a visit of "about a couple hours" duration to Ensenada, Mexico, in August 1956. The Immigration and Naturalization Service, of which petitioner Rosenberg is the Los Angeles District Director, sought in April 1959 to deport respondent on the ground that at the time of his return in 1956 he "was within one or more of the classes of aliens excludable by the law existing at the time of such entry," Immigration and Nationality Act of 1952, § 241 (a)(1), 66 Stat. 204, 8 U. S. C. § 1251 (a)(1). In particular, the Service alleged that respondent had been "convicted of a crime involving moral turpitude," § 212 (a)(9), 66 Stat. 182, 8 U. S. C. § 1182 (a)(9), before his 1956 return, and had for that reason been excludable when he came back from his brief trip to Mexico. A deportation order issued on that ground, but it was discovered a few months later that the order was invalid, because the crime was a petty offense not of the magnitude encompassed within the statute. The deportation proceedings were thereupon reopened and a new charge was lodged against respondent: that he had been excludable

at the time of his 1956 return as an alien "afflicted with psychopathic personality," § 212 (a)(4), 66 Stat. 182, 8 U. S. C. § 1182 (a)(4), by reason of the fact that he was a homosexual. Deportation was ordered on this ground and Fleuti's appeal to the Board of Immigration Appeals was dismissed, whereupon he brought the present action for declaratory judgment and review of the administrative action. It was stipulated that among the issues to be litigated was the question whether § 212 (a)(4) is "unconstitutional as being vague and ambiguous." The trial court rejected respondent's contentions in this regard and in general, and granted the Government's motion for summary judgment. On appeal, however, the United States Court of Appeals for the Ninth Circuit set aside the deportation order and enjoined its enforcement, holding that as applied to Fleuti § 212 (a)(4) was unconstitutionally vague in that homosexuality was not sufficiently encompassed within the term "psychopathic personality." 302 F. 2d 652.

The Government petitioned this Court for certiorari, which we granted in order to consider the constitutionality of § 212 (a)(4) as applied to respondent Fleuti. 371 U. S. 859. Upon consideration of the case, however, and in accordance with the long-established principle that "we ought not to pass on questions of constitutionality . . . unless such adjudication is unavoidable," *Spector Motor Service, Inc.,* v. *McLaughlin,* 323 U. S. 101, 105; see also *Alma Motor Co.* v. *Timken-Detroit Axle Co.,* 329 U. S. 129; *Neese* v. *Southern R. Co.,* 350 U. S. 77; *Mackey* v. *Mendoza-Martinez,* 362 U. S. 384, we have concluded that there is a threshold issue of statutory interpretation in the case, the existence of which obviates decision here as to whether § 212 (a)(4) is constitutional as applied to respondent.

That issue is whether Fleuti's return to the United States from his afternoon trip to Ensenada, Mexico, in

August 1956 constituted an "entry" within the meaning of § 101 (a)(13) of the Immigration and Nationality Act of 1952, 66 Stat. 167, 8 U. S. C. § 1101 (a)(13), such that Fleuti was excludable for a condition existing at that time even though he had been permanently and continuously resident in this country for nearly four years prior thereto. Section 101 (a)(13), which has never been directly construed by this Court in relation to the kind of brief absence from the country that characterizes the present case,[1] reads as follows:

> "The term 'entry' means any coming of an alien into the United States, from a foreign port or place or from an outlying possession, whether voluntarily or otherwise, except that an alien having a lawful permanent residence in the United States shall not be regarded as making an entry into the United States for the purposes of the immigration laws if the alien proves to the satisfaction of the Attorney General that his departure to a foreign port or place or to an outlying possession was not intended or reasonably to be expected by him or his presence in a foreign port or place or in an outlying possession was not voluntary: *Provided,* That no person whose departure from the United States was occasioned by deportation proceedings, extradition, or other legal process shall be held to be entitled to such exception."

The question we must consider, more specifically, is whether Fleuti's short visit to Mexico can possibly be regarded as a "departure to a foreign port or place . . . [that] was not intended," within the meaning of the

---

[1] Although there is dictum on the point of *Bonetti* v. *Rogers,* 356 U. S. 691, 698–699, we regard it as not fully considered, since resolution of the issue was not crucial to decision of the case. Compare *Shaughnessy* v. *United States ex rel. Mezei,* 345 U. S. 206, 213.

exception to the term "entry" created by the statute. Whether the 1956 return was within that exception is crucial, because Fleuti concededly was not excludable as a "psychopathic personality" at the time of his 1952 entry.[2]

The definition of "entry" as applied for various purposes in our immigration laws was evolved judicially, only becoming encased in statutory form with the inclusion of § 101 (a) (13) in the 1952 Act. In the early cases there was developed a judicial definition of "entry" which had harsh consequences for aliens. This viewpoint was expressed most restrictively in *United States ex rel. Volpe* v. *Smith*, 289 U. S. 422, in which the Court, speaking through Mr. Justice McReynolds, upheld deportation of an alien who, after 24 years of residence in this country following a lawful entry, was held to be excludable on his return from "a brief visit to Cuba," *id.*, at 423. The Court stated that "the word 'entry' . . . includes any coming of an alien from a foreign country into the United States whether such coming be the first or any subsequent one." *Id.*, at 425.[3] Although cases in the lower courts applying the

---

[2] The 1952 Act became effective on December 24, 1952, and Fleuti entered the country for permanent residence on October 9, 1952, a fact which is of significance because § 241 (a) (1) of the Act only commands the deportation of aliens "excludable by the law existing at the time of such entry . . . ." Hence, since respondent's homosexuality did not make him excludable by any law existing at the time of his 1952 entry, it is critical to determine whether his return from a few hours in Mexico in 1956 was an "entry" in the statutory sense. If it was not, the question whether § 212 (a) (4) could constitutionally be applied to him need not be resolved.

[3] Previous cases which contain the same general kind of language, but which are distinguishable on their facts, are *Lapina* v. *Williams*, 232 U. S. 78; *Lewis* v. *Frick*, 233 U. S. 291; *United States ex rel. Claussen* v. *Day*, 279 U. S. 398; *United States ex rel. Polymeris* v. *Trudell*, 284 U. S. 279; and *United States ex rel. Stapf* v. *Corsi*, 287 U. S. 129. The only one of these cases which involved an absence from the country as extremely brief as Fleuti's is *Lewis* v. *Frick*, and

strict re-entry doctrine to aliens who had.left the country
for brief visits to Canada or Mexico or elsewhere were
numerous,[4] many courts. applied the doctrine in such
instances with express reluctance and explicit recognition
of its harsh consequences,[5] and there were a few instances
in which district judges refused to hold that aliens who
had been absent from the country only briefly had made
"entries" upon their return.[6]

Reaction to the severe effects produced by adherence
to the strict definition of "entry" resulted in a substantial
inroad being made upon that definition in 1947 by a
decision of the Second Circuit and a decision of this Court.
The Second Circuit, in an ' opinion by Judge Learned
Hand, refused to allow a deportation which depended on
the alien's being regarded as having re-entered this coun-

---

in that case deportation was premised on the fact that on his return
from the trip in issue the alien had sought to bring a woman into the
country for an immoral purpose. 233 U. S., at 297–300.

[4] E. g., Ex parte Parianos, 23 F. 2d 918 (C. A. 9th Cir. 1928);
United States ex rel. Medich v. Burmaster, 24 F. 2d 57 (C. A. 8th
Cir. 1928); Cahan v. Carr, 47 F. 2d 604 (C. A. 9th Cir. 1931), cert.
denied, 283 U. S. 862; Zurbrick v. Borg, 47 F. 2d 690 (C. A. 6th Cir.
1931); Taguchi v. Carr, 62 F. 2d 307 (C. A. 9th Cir. 1932); Ward v.
De Barros, 75 F. 2d 34 (C. A. 1st Cir. 1935); Guarneri v. Kessler, 98
F. 2d 580 (C. A. 5th Cir. 1938), cert. denied, 305 U. S. 648; Del
Castillo v. Carr, 100 F. 2d 338 (C. A. 9th Cir. 1938); United States
ex rel. Kowalenski v. Flynn, 17 F. 2d 524 (D. C. W. D. N. Y. 1927);
United States ex rel. Siegel v. Reimer, 23 F. Supp. 643 (D. C. S. D.
N. Y.), aff'd, 97 F. 2d 1020 (C. A. 2d Cir. 1938).

[5] E. g., Jackson v. Zurbrick, 59 F. 2d 937 (C. A. 6th Cir. 1932);
Zurbrick v. Woodhead, 90 F. 2d 991 (C. A. 6th Cir. 1937); United
States ex rel. Ueberall v. Williams, 187 F. 470 (D. C. S. D. N. Y.
1911); Guimond v. Howes, 9 F. 2d 412 (D. C. D. Maine 1925); Ex
parte Piazzola, 18 F. 2d 114 (D. C. W. D. N. Y. 1926).

[6] In re Michael Bonadino, D. C. W. D. N. Y., unreported, Dec. 20,
1924; United States ex rel. Valenti v. Karmuth, 1 F. Supp. 370 (D. C.
N. D. N. Y. 1932); Annello ex rel. Annello v. Ward, 8 F. Supp. 797
(D. C. D. Mass. 1934).

try after having taken an overnight sleeper from Buffalo to Detroit on a route lying through Canada. *Di Pasquale* v. *Karnuth,* 158 F. 2d 878. Judge Hand recognized that the alien "acquiesced in whatever route the railroad might choose to pull the car," *id.,* at 879, but held that it would be too harsh to impute the carrier's intent to the alien, there being no showing that the alien knew he would be entering Canada. "Were it otherwise," Judge Hand went on, "the alien would be subjected without means of protecting himself to the forfeiture of privileges which may be, and often are, of the most grave importance to him." *Ibid.* If there were a duty upon aliens to inquire about a carrier's route, it "would in practice become a trap, whose closing upon them would have no rational relation to anything they could foresee as significant. We cannot believe that Congress meant to subject those who had acquired a residence, to the sport of chance, when the interests at stake may be so momentous." *Ibid.* Concluding, Judge Hand said that if the alien's return were held to be an "entry" under the circumstances, his "vested interest in his residence" would

> "be forfeited because of perfectly lawful conduct which he could not possibly have supposed would result in anything of the sort. Caprice in the incidence of punishment is one of the indicia of tyranny, and nothing can be more disingenuous than to say that deportation in these circumstances is not punishment. It is well that we should be free to rid ourselves of those who abuse our hospitality; but it is more important that the continued enjoyment of that hospitality once granted, shall not be subject to meaningless and irrational hazards." *Ibid.*

Later the same year this Court, because of a conflict between *Di Pasquale* and *Del Guercio* v. *Delgadillo,* 159 F. 2d 130 (C. A. 9th Cir. 1947), granted certiorari in the

latter case and reversed a deportation order affecting an alien who, upon rescue after his intercoastal merchant ship was torpedoed in the Caribbean during World War II, had been taken to Cuba to recuperate for a week before returning to this country. *Delgadillo* v. *Carmichael,* 332 U. S. 388. The Court pointed out that it was "the exigencies of war, not his voluntary act," *id.,* at 391, which put the alien on foreign soil, adding that "[w]e might as well hold that if he had been kidnapped and taken to Cuba, he made a statutory 'entry' on his voluntary return. Respect for law does not thrive on captious interpretations." *Ibid.* Since "[t]he stakes are indeed high and momentous for the alien who has acquired his residence here," *ibid.,* the Court held that

"[w]e will not attribute to Congress a purpose to make his right to remain here dependent on circumstances so fortuitous and capricious as those upon which the Immigration Service has here seized. The ha ards to which we are now asked to subject the alien are too irrational to square with the statutory scheme." *Ibid.*

The increased protection of returning resident aliens which was brought about by the *Delgadillo* decision, both in its result and in its express approval of *Di Pasquale,* was reflected in at least two subsequent lower-court decisions prior to the enactment of § 101 (a)(13). In *Yukio Chai* v. *Bonham,* 165 F. 2d 207 (C. A. 9th Cir. 1947), the court held that no "entry" had occurred after a ship carrying a resident alien back from seasonal cannery work in Alaska made an unscheduled stop in Vancouver, B. C., and in *Carmichael* v. *Delaney,* 170 F. 2d 239 (C. A. 9th Cir. 1948), the court held that a resident alien returning from wartime service with the United States Maritime Service during which he had stopped at many foreign ports made no "entry" because all of the movements of

the ship to which he had been assigned were pursuant to Navy orders.[7]

It was in light of all of these developments in the case law that § 101 (a)(13) was included in the immigration laws with the 1952 revision. As the House and Senate Committee Reports, the relevant material from which is quoted in the margin,[8] make clear, the major congressional

---

[7] It should be pointed out, however, that the Ninth Circuit has, subsequent to the decisions cited in the text, held specifically that length of time outside the country is still irrelevant to the question of "entry." *Schoeps* v. *Carmichael*, 177 F. 2d 391 (C. A. 9th Cir. 1949), cert. denied, 339 U. S. 914; *Pimental-Navarro* v. *Del Guercio*, 256 F. 2d 877 (C. A. 9th Cir. 1958).

[8] The House and Senate Committee Reports preceding enactment of the bill both contained the following relevant paragraph:

"Section 101 (a)(13) defines the term 'entry.' Frequent reference is made to the term 'entry' in the immigration laws, and many consequences relating to the entry and departure of aliens flow from its use, but the term is not precisely defined in the present law. Normally an entry occurs when the alien crosses the border of the United States and makes a physical entry, and the question of whether an entry has been made is susceptible of a precise determination. However, for the purposes of determining the effect of a subsequent entry upon the status of an alien who has previously entered the United States and resided therein, the preciseness of the term 'entry' has not been found to be as apparent. Earlier judicial constructions of the term in the immigration laws, as set forth in *Volpe* v. *Smith* (289 U. S. 422 (1933)), generally held that the term 'entry' included any coming of an alien from a foreign country to the United States whether such coming be the first or a subsequent one. More recently, the courts have departed from the rigidity of that rule and have recognized that an alien does not make an entry upon his return to the United States from a foreign country where he had no intent to leave the United States (*Di Pasquale* v. *Karnuth*, 158 F. 2d 878 (C. C. A. 2d 1947)), or did not leave the country voluntarily (*Delgadillo* v. *Carmichael*, 332 U. S. 388 (1947)). The bill defines the term 'entry' as precisely as practicable, giving due recognition to the judicial precedents. Thus any coming of an alien from a foreign port or place or an outlying possession into the United States is to be considered an entry, whether voluntary or otherwise, unless the

concern in codifying the definition of "entry" was with "the status of an alien who has previously entered the United States and resided therein . . . ." This concern was in the direction of ameliorating the harsh results visited upon resident aliens by the rule of *United States ex rel. Volpe* v. *Smith, supra,* as is indicated by the recognition that "the courts have departed from the rigidity of . . . [the earlier] rule," and the statement that "[t]he bill . . . [gives] due recognition to the judicial precedents." It must be.recognized, of course, that the only liberalizing decisions to which the Reports referred specifically were *Di Pasquale* and *Delgadillo,* and that there is no indication one way or the other in the legislative history of what Congress thought about the problem of resident aliens who leave the country for insignificantly short periods of time. Nevertheless, it requires but brief consideration of the policies underlying § 101 (a)(13), and of certain other aspects of the rights of returning resident aliens, to conclude that Congress, in approving the judicial undermining of *Volpe, supra,* and the relief brought about by the *Di Pasquale* and *Delgadillo* decisions, could not have meant to limit the meaning of the exceptions it created in § 101 (a)(13) to the facts of those two cases.

The most basic guide to congressional intent as to the reach of the exceptions is the eloquent language of *Di Pasquale* and *Delgadillo* themselves, beginning with the recognition that the "interests at stake" for the resident alien are "momentous," 158 F. 2d, at 879, and that "[t]he stakes are indeed high and momentous for the alien who has acquired his residence here," 332 U. S., at 391. This

Attorney General is satisfied that the departure of the alien, other than a deportee, from this country was unintentional or was not voluntary." H. R. Rep. No. 1365, 82d Cong., 2d Sess. 32 (1952); S. Rep. No. 1137, 82d Cong., 2d Sess. 4 (1952).

general premise of the two decisions impelled the more general conclusion that "it is . . . important that the continued enjoyment of . . . [our] hospitality once granted, shall not be subject to meaningless and irrational hazards." 158 F. 2d, at 879. See also *Delgadillo, supra,* at 391. Coupling these essential principles of the two decisions explicitly approved by Congress in enacting § 101 (a)(13) with the more general observation, appearing in *Delgadillo* as well as elsewhere,[9] that "[d]eportation can be the equivalent of banishment or exile," it is difficult to conceive that Congress meant its approval of the liberalization wrought by *Di Pasquale* and *Delgadillo* to be interpreted mechanistically to apply only to cases presenting factual situations identical to what was involved in those two decisions.

The idea that the exceptions to § 101 (a)(13) should be read nonrestrictively is given additional credence by the way in which the immigration laws define what constitutes "continuous residence" for an alien wishing to be naturalized. Section 316 of the 1952 Act, 66 Stat. 242–243, 8 U. S. C. § 1427, which liberalized previous law in some respects, provides that an alien who wishes to seek naturalization does not begin to endanger the five years of "continuous residence" in this country which must precede his application until he remains outside the country for six months, and does not damage his position by cumulative temporary absences unless they total over half of the five years preceding the filing of his petition for naturalization. This enlightened concept of what constitutes a meaningful interruption of the continuous residence which must support a petition for naturalization, reflecting as it does a congressional judgment that an

---

[9] See *Ng Fung Ho* v. *White,* 259 U. S. 276, 284; *Bridges* v. *Wixon,* 326 U. S. 135, 147; *Fong Haw Tan* v. *Phelan,* 333 U. S. 6, 10; *Barber* v. *Gonzales,* 347 U. S. 637, 642–643.

alien's status is not necessarily to be endangered by his absence from the country, strengthens the foundation underlying a belief that the exceptions to § 101 (a)(13) should be read to protect resident aliens who are only briefly absent from the country. Of further, although less specific, effect in this regard is this Court's holding in *Kwong Hai Chew* v. *Colding*, 344 U. S. 590, that the returning resident alien is entitled as a matter of due process to a hearing on the charges underlying any attempt to exclude him, a holding which supports the general proposition that a resident alien who leaves this country is to be regarded as retaining certain basic rights.

Given that the congressional protection of returning resident aliens in § 101 (a)(13) is not to be woodenly construed, we turn specifically to construction of the exceptions contained in that section as they relate to resident aliens who leave the country briefly. What we face here is another harsh consequence of the strict "entry" doctrine which, while not governed directly by *Delgadillo*, nevertheless calls into play the same considerations, pp. 454–456; 458–459, *supra*, which led to the results specifically approved in the Congressional Committee Reports. It would be as "fortuitous and capricious," and as "irrational to square with the statutory scheme," *Delgadillo*, *supra*, at 391, to hold that an alien may necessarily be deported because he falls into one of the classes enumerated in § 212 (a) when he returns from "a couple hours" visit to Mexico as it would have been to uphold the order of deportation in *Delgadillo*. Certainly when an alien like Fleuti who has entered the country lawfully and has acquired a residence here steps across a border and, in effect, steps right back, subjecting him to exclusion for a condition for which he could not have been deported had he remained in the country seems to be placing him at the mercy of the "sport of chance" and the "meaningless and irrational hazards" to which Judge Hand alluded. *Di*

*Pasquale, supra,* at 879.   In making such a casual trip the
alien would seldom be aware that he was possibly walking
into a trap, for the insignificance of a brief trip to Mexico
or Canada bears little rational relation to the punitive
consequence of subsequent excludability.   There are, of
course, valid policy reasons for saying that an alien wish-
ing to retain his classification as a permanent resident of
this country imperils his status by interrupting his resi-
dence too frequently or for an overly long period of time,
but we discern no rational policy supporting application
of a re-entry limitation in all cases in which a resident
alien crosses an international border for a short visit.[10]
Certainly if that trip is innocent, casual, and brief, it is
consistent with all the discernible signs of congressional
purpose to hold that the "departure . . . was not in-
tended" within the meaning and ameliorative intent of
the exception to § 101 (a)(13).   Congress unquestion-
ably has the power to exclude all classes of undesir-
able aliens from this country, and the courts are charged
with enforcing such exclusion when Congress has directed
it, but we do not think Congress intended to exclude
aliens long resident in this country after lawful entry
who have merely stepped across an international border
and returned in "about a couple of hours."   Such a hold-
ing would be inconsistent with the general purpose of

---

[10] Compare Bernard, American Immigration Policy (1950), 296;
Gordon, When Does an Alien Enter the United States? 9 Fed. B. J.
248, 250, 258–259 (1948); Hofstein, The Returning Resident Alien,
10 Intra. L. Rev. 271, 273, 280 (1955); Konvitz, Civil Rights in
Immigration (1953), 92; Maslow, Recasting Our Deportation Law:
Proposals for Reform, 56 Col. L. Rev. 309, 327–329 (1956); Report
of the President's Commission on Immigration and Naturalization,
Whom We Shall Welcome (1953), 179–180, 199–200; Note, Rights
of Aliens in Exclusion Proceedings, 3 Utah L. Rev. 349, 350 n.
20 (1953); Note, Limitations on Congressional Power to Deport
Resident Aliens Excludable as Psychopaths at Time of Entry, 68
Yale L. J. 931, 937–938 n. 25 (1959).

Congress in enacting § 101 (a)(13) to ameliorate the severe effects of the strict "entry" doctrine.

We conclude, then, that it effectuates congressional pur- pose to construe the intent exception to § 101 (a)(13) as meaning an intent to depart in a manner which can be regarded as meaningfully interruptive of the alien's per- manent residence. One major factor relevant to whether such intent can be inferred is, of course, the length of time the alien is absent. Another is the purpose of the visit, for if the purpose of leaving the country is to accomplish some object which is itself contrary to some policy reflected in our immigration laws, it would appear that the interruption of residence thereby occurring would prop- erly be regarded as meaningful. Still another is whether the alien has to procure any travel documents in order to make his trip, since the need to obtain such items might well cause the alien to consider more fully the implications involved in his leaving the country. Although the oper- ation of these and other possibly relevant factors remains to be developed "by the gradual process of judicial inclu- sion and exclusion," *Davidson* v. *New Orleans*, 96 U. S. 97, 104, we declare today simply that an innocent, casual, and brief excursion by a resident alien outside this coun- try's borders may not have been "intended" as a depar- ture disruptive of his resident alien status and therefore may not subject him to the consequences of an "entry" into the country on his return. The more civilized appli- cation of our immigration laws given recognition by Congress in § 101 (a)(13) and other provisions of the 1952 Act protects the resident alien from unsuspected risks and unintended consequences of such a wholly inno- cent action. Respondent here, so far as appears from the record, is among those to be protected. However, because attention was not previously focused upon the application of § 101 (a)(13) to the case, the record con- tains no detailed description or characterization of his

trip to Mexico in 1956, except for his testimony that he was gone "about a couple hours," and that he was "just visiting; taking a trip." That being the case, we deem it appropriate to remand the case for further consideration of the application of § 101 (a)(13) to this case in light of our discussion herein. If it is determined that respondent did not "intend" to depart in the sense contemplated by § 101 (a)(13), the deportation order will not stand and adjudication of the constitutional issue reached by the court below will be obviated. The judgment of the Court of Appeals is therefore vacated and the case remanded with directions that the parties be given leave to amend their pleadings to put in issue the question of "entry" in accordance with the foregoing, and for further proceedings consistent herewith.

*So ordered.*

MR. JUSTICE CLARK, with whom MR. JUSTICE HARLAN, MR. JUSTICE STEWART and MR. JUSTICE WHITE join, dissenting.

I dissent from the Court's judgment and opinion because "statutory construction" means to me that the Court can *construe* statutes but not that it can *construct* them. The latter function is reserved to the Congress, which clearly said what it meant and undoubtedly meant what it said when it defined "entry" for immigration purposes as follows:

"The term 'entry' means any coming of an alien into the United States, from a foreign port or place or from an outlying possession, whether voluntarily or otherwise, except that an alien having a lawful permanent residence in the United States shall not be regarded as making an entry into the United States for the purposes of the immigration laws if the alien proves to the satisfaction of the Attorney General

that his departure to a foreign port or place or to an outlying possession was not intended or reasonably to be expected by him or his presence in a foreign port or place or in an outlying possession was not voluntary. . . ." 8 U. S. C. § 1101 (a)(13)'.

That this definition of "entry" includes the respondent's entry after his brief trip to Mexico in 1956 is a conclusion which seems to me inescapable. The conclusion is compelled by the plain meaning of the statute, its legislative history, and the consistent interpretation by the federal courts. Indeed, the respondent himself did not even question that his return to the United States was an "entry" within the meaning of § 101 (a)(13). Nonetheless, the Court has rewritten the Act *sua sponte,* creating a definition of "entry" which was suggested by many organizations during the hearings prior to its enactment but which was rejected by the Congress. I believe the authorities discussed in the Court's opinion demonstrate that "entry" as defined in § 101 (a)(13) cannot mean what the Court says it means, but I will add a few words of explanation.

The word "entry" had acquired a well-defined meaning for immigration purposes at the time the Immigration and Nationality Act was passed in 1952. The leading case was *United States ex rel. Volpe* v. *Smith,* 289 U. S. 422 (1933), which held that an alien who had resided continuously in the United States for 26 years except for a brief visit to Cuba made an "entry" at the time of his return from Cuba. The Court there stated that the word "entry" in the Immigration Act of 1917 "includes any coming of an alien from a foreign country into the United States whether such coming be the first or any subsequent one." *Id.,* at 425. That conclusion was based on sound authority, since the Court had earlier held that a resident alien who crossed the river from Detroit to Windsor, Canada, and returned on the same day made

an "entry" upon his return. *Lewis* v. *Frick,* 233 U. S. 291 (1914).

The federal courts in numerous cases were called upon to apply this definition of "entry" and did so consistently, specifically recognizing that the brevity of one's stay outside the country was immaterial to the question of whether his return was an "entry." See, *e. g., United States ex rel. Kowalenski* v. *Flynn,* 17 F. 2d 524 (D. C. W. D. N. Y. 1927); *Schoeps* v. *Carmichael,* 177 F. 2d 391 (C. A. 9th Cir. 1949). A related but obviously distinguishable question did create difficulties for the courts, however, leading to conflicting opinions among the Circuits as to whether a resident alien makes an "entry" when he had no intent to leave the country or did not leave voluntarily. It was decided by this Court in *Delgadillo* v. *Carmichael,* 332 U. S. 388 (1947), which held that an alien whose ship had been torpedoed and sunk, after which he was rescued and taken to Cuba for a week, did not make an "entry" on his return to the United States. The Court discussed the *Volpe* case but distinguished it and others on the ground that "those were cases where the alien plainly expected or planned to enter a foreign port or place. Here he was catapulted into the ocean, rescued, and taken to Cuba. He had no part in selecting the foreign port as his destination." *Id.,* at 390. The Court specifically relied on *Di Pasquale* v. *Karnuth,* 158 F. 2d 878 (C. A. 2d Cir. 1947), where an alien who had ridden a sleeping car from Buffalo to Detroit, without knowledge that the train's route was through Canada, was held not to have made an "entry" upon his arrival in Detroit.

These cases and others discussed by the Court establish the setting in which the Immigration and Nationality Act was passed in 1952. The House and Senate reports quoted by the Court show that the Congress recognized the courts' difficulty with the rule that "any coming" of

an alien into the United States was an "entry," even when the departure from the country was unintentional or involuntary. The reports discuss the broad rule of the *Volpe* case and the specific limitations of the *Di Pasquale* and *Delgadillo* cases, citing those cases by name, and conclude with the following language:

> "The bill defines the term 'entry' as precisely as practicable, giving due recognition to the judicial precedents. Thus any coming of an alien from a foreign port or place or an outlying possession into the United States is to be considered an entry, whether voluntary or otherwise, unless the Attorney General is satisfied that the departure of the alien, other than a deportee, from this country was unintentional or was not voluntary." H. R. Rep. No. 1365, 82d Cong., 2d Sess. 32; S. Rep. No. 1137, 82d Cong., 2d Sess. 4.

Thus there is nothing in the legislative history or in the statute itself which would exempt the respondent's return from Mexico from the definition of "entry." Rather, the statute in retaining the definition expressed in *Volpe* seems clearly to cover respondent's entry, which occurred after he knowingly left the United States in order to travel to a city in Mexico. That the trip may have been "innocent, casual, and brief" does not alter the fact that, in the words of the Court in *Delgadillo*, the respondent "plainly expected or planned to enter a foreign port or place." 332 U. S., at 390.

It is true that this application of the law to a resident alien may be harsh, but harshness is a far cry from the irrationality condemned in *Delgadillo*, *supra*, at 391. There and in *Di Pasquale* contrary results would have meant that a resident alien, who was not deportable unless he left the country and reentered, could be deported as a result of circumstances either beyond his control or

beyond his knowledge. Here, of course, there is no claim that respondent did not know he was leaving the country to enter Mexico and, since one is presumed to know the law, he knew that his brief trip and reentry would render him deportable. The Congress clearly has chosen so to apply the long-established definition, and this Court cannot alter that legislative determination in the guise of statutory construction. Had the Congress not wished the definition of "entry" to include a return after a brief but voluntary and intentional trip, it could have done so. The Court's discussion of § 316 of the Act shows that the Congress knows well how to temper rigidity when it wishes. Nor can it be said that the Congress was unaware of the breadth of its definition. Even aside from the evidence that it was aware of the judicial precedents, numerous organizations unsuccessfully urged that the definition be narrowed to accomplish what the Court does today. Thus, it was urged that the Act's definition of "entry" "should, we believe, be narrowed so that it will not be applicable to an alien returning from abroad, after a temporary absence, to an unrelinquished domicile here." [1] Other groups complained also that "[t]he term 'entry' is defined to mean any coming of an alien into the United States. It is recommended that this be narrowed to provide that a return, after a temporary absence, to an unrelinquished domicile, shall not constitute a new entry." [2] Despite such urging, however, the Congress made no change in the definition. Further, this Court

---

[1] Statement of Edward J. Ennis, Representing the American Civil Liberties Union, printed in Joint Hearings before the Subcommittees of the Committees on the Judiciary on S. 716, H. R. 2379, and H. R. 2816, 82d Cong., 1st Sess. 143.

[2] Recommendations and Suggestions With Respect to Titles I and II of S. 716 and H. R. 2379, printed in Joint Hearings, *supra*, note 1, at 617. See also Testimony of Stanley H. Lowell on Behalf of Americans for Democratic Action, *id.*, at 445.

in 1958 specifically recognized that the word "entry" retained its plain meaning, stating that "a resident alien who leaves the country for any period, however brief, does make a new entry on his return . . . ." *Bonetti v. Rogers,* 356 U. S. 691, 698.

All this to the contrary notwithstanding, the Court today decides that one does not really intend to leave the country unless he plans a long trip, or his journey is for an illegal purpose, or he needs travel documents in order to make the trip. This is clearly contrary to the definition in the Act and to any definition of "intent" that I was taught.[3]

What the Court should do is proceed to the only question which either party sought to resolve: whether the deportation order deprived respondent of due process of law in that the term "afflicted with psychopathic personality," as it appears in § 212 (a)(4) of the Act, is unconstitutionally vague. Since it fails to do so, I must dissent.

---

[3] See, *e. g., Morissette v. United States,* 342 U. S. 246 (1952); Hall, General Principles of Criminal Law (2d ed. 1960), 105–145; Prosser, Torts (2d ed. 1955), 29–30.