## MATTER OF ABI-RACHED

### In DEPORTATION Proceedings

### A-10640981

*Decided by Board May 13, 1964*

(1) Conviction of voluntary manslaughter in violation of section 9–2, chapter 38, Illinois Revised Statutes, is conviction of a crime involving moral turpitude.
(2) The return to the United States of respondent, a lawful permanent resident, following a month's vacation in Mexico constitutes an entry under section 101 (a) (13), Immigration and Nationality Act, upon which to predicate a ground of deportation. [*Rosenberg* v. *Fleuti*, 374 U.S. 449, distinguished.]

CHARGES:

Order: Act of 1952—Section 241(a) (4) [8 U.S.C. 1251(a) (4)]—Convicted of crime committed within five years after entry and confined for a year or more, to wit: voluntary manslaughter.

Lodged: Act of 1952—Section 241(a) (4) [8 U.S.C. 1251(a) (4)]—Convicted of crime committed within five years after entry and sentenced to confinement for a year or more, to wit: voluntary manslaughter.

Respondent is 42 years old, married, male, a native and citizen of Mexico. He last entered the United States at Laredo, Texas, on or about July 1961. The special inquiry officer found him deportable on the lodged charge, and not eligible for any form of discretionary relief, and certified the case to the Board for final decision. The special inquiry officer's order and decision will be approved.

Respondent was admitted to the United States for permanent residence in 1956. He departed on three occasions between 1956 and 1962, each time returning to Mexico for a one-month visit with his family in Tampico. He testified that he went to Mexico in 1958, 1960, and 1961. He did not remain longer than one month, because he did not want to lose his job in Chicago.

Respondent was convicted in the Criminal Court of Cook County, Illinois, on February 28, 1963, for the offense of voluntary manslaughter in violation of Chapter 38, Section 9–2, of the Illinois Revised Statutes. He was sentenced to confinement in the Illinois State

Penitentiary for a term of not less than one year and not more than 15 years. The record of his conviction is part of the record before us. Respondent testified that he did not commit voluntary manslaughter but that he was defending himself against someone seeking to kill him. He believes that he in fact committed involuntary manslaughter. The indictment returned against respondent by the grand jury contained three counts: murder, manslaughter, and involuntary manslaughter. Respondent plead guilty to having committed the crime of voluntary manslaughter, and the court found him guilty of that crime in the manner and form as charged in the indictment. This Board does not have the authority to re-try criminal convictions. As found by the special inquiry officer, the crime is conclusively established by the record of conviction, and the Board is precluded from looking outside the record. The crime of voluntary manslaughter is an offense involving moral turpitude.

Respondent raised the issue as to whether or not he had committed a crime within five years after entry, in that he has resided in the United States since his entry in 1956. The special inquiry officer found that respondent made an entry when he returned from Mexico in July 1961, and we affirm this finding. In *Rosenberg v. Fleuti*, 374 U.S. 449, 10 L.ed. 2d 1000, the Supreme Court found that the alien had not made an "entry" as defined in section 101(a)(13) of the Immigration and Nationality Act.[1] We agree with the special inquiry officer that the respondent's entry in July 1961, and also his entries following his 1958 and 1960 trips to Mexico constituted entries within the definition of the statute. The instant case is distinguishable on its facts from *Fleuti* for the following reasons: (1) Respondent's entry on each occasion was made after a one-month vacation to Mexico, whereas Fleuti went into Mexico and returned after "about a couple hours" to quote the Supreme Court decision. A one-month vacation does not fall within the Supreme Court references to the brief absence of one who "merely stepped across an international border".

___

[1] Section 101(a)(13), Immigration and Nationality Act: The term "entry" means any coming of an alien into the United States, from a foreign port or place or from an outlying possession, whether voluntarily or otherwise, except that an alien having a lawful permanent residence in the United States shall not be regarded as making an entry into the United States for the purposes of the immigration laws if the alien proves to the satisfaction of the Attorney General that his departure to a foreign port or place or to an outlying possession was not intended or reasonably to be expected by him or his presence in a foreign port or place or in an outlying possession was not voluntary: *Provided*, That no person whose departure from the United States was occasioned by deportation proceedings, extradition, or other legal process shall be held to be entitled to such exception.

The court states, "One major factor relevant to whether such intent can be inferred is of course the length of time the alien is absent". The length of the visit is, of course, only one factor. Respondent intended to resume his residence in the United States at the end of his vacation, but this intent alone certainly does not preserve him from having made a departure and reentry. He knowingly and intentionally departed from the United States and remained outside this country for one month on three separate occasions. (2) The Supreme Court referred in *Fleuti* to whether or not it was necessary for an alien to obtain or present documents upon his return to the United States. There was no showing that Fleuti had used documents for his reentry. Respondent testified that he had presented his "mica", referring to his Alien Registration Receipt Card, Form I-151, upon his return from each of his three vacation trips. (3) Respondent did not become deportable by the mere fact of his trip to Mexico and his return. The Court was concerned in *Fleuti* with the severity of an interpretation which placed the alien at the mercy of the "chance" and with the "meaningless and irrational hazards of a strict entry doctrine which resulted in making a resident alien deportable who would not otherwise have been deportable". Fleuti concededly was not excludable as a psychopathic personality at the time of his 1952 entry, according to the court. However, as the result of his 1956 departure to Mexico and return, the Government contended that Fleuti was deportable as an alien afflicted with psychopathic personality at the time of his 1956 return. In the case now before us, deportability is based upon the conviction of respondent for a crime he committed following his return from Mexico. It is the commission of the crime, rather than the reentry which made him deportable. In the case of Fleuti, it was the departure and return which completed the formula by which he became deportable. This distinction, made by the special inquiry officer, is, we think, an important variation from the facts in *Fleuti*. For the above reasons, we find that respondent made an entry from a foreign port or country under section 101(a)(13) of the Immigration and Nationality Act when he returned from Mexico in 1961.

Respondent is deportable on the lodged charge for having committed a crime involving moral turpitude within five years after entry for which he was convicted and sentenced to imprisonment for a year or more. The special inquiry officer found correctly that respondent is precluded from establishing good moral character under section 101(f)(3) and 101(f)(7) of the Immigration and Nationality Act, and is not eligible for any form of discretionary relief. He has des-

ignated Mexico as the country to which his deportation should be directed. The special inquiry officer's order of January 30, 1964, will be approved.

ORDER: It is ordered that no change be made in the special inquiry officer's order of January 30, 1964.