MATTER OF NAKOI

In Deportation Proceedings

A-13933641

*Decided by Board October 11, 1972*

A lawful permanent resident alien's departure to Canada in August 1967 to fulfill a 9-month-academic-year teaching contract was not an "innocent, casual, and brief excursion abroad" within the ambit of *Rosenberg v. Fleuti*, 374 U.S. 449 (1963), notwithstanding a continuing intent to maintain his United States residence; hence, upon his return to the United States in December 1967 he made an "entry" within the meaning of section 101(a)(13) of the Immigration and Nationality Act upon which to predicate a ground of deportation.

CHARGE:

Order: Act of 1952—Section 241(a)(4) [8 U.S.C. 1251]—Convicted of crime involving moral turpitude committed within five years after entry and sentenced to confinement or confined therefor in a prison or corrective institution for a year or more (kidnapping—18 U.S.C. 1201—1970)

ON BEHALF OF RESPONDENT:
Julius C. Biervliet, Esquire
Legal Aid Society
11 Park Place
New York, New York 10007
(Oral argument scheduled but counsel did not appear)

ON BEHALF OF SERVICE:
A. L. Tadlock
Acting Trial Attorney
(Brief filed)

On March 14, 1972, having no application for discretionary relief before her for consideration, the special inquiry officer directed that the respondent, who had conceded deportability, be deported from the United States to Austria on the charge contained in the order to show cause. The respondent, who was not then represented by counsel, waived his right to appeal from that decision, which thereby became final. A warrant for his deportation was issued on April 6, 1972.

The respondent subsequently moved for reopening of his proceedings. That motion, which was unopposed by the Service, was granted and a further hearing was held. On September 1, 1972, the special inquiry officer again entered an order of deportation, as

above. The respondent took a timely appeal therefrom, to bring the case before this Board for review. That appeal will be dismissed.

The respondent, a 35-year-old single male alien, is a native of Hungary and a naturalized citizen of Austria. He was originally admitted to the United States as a student in 1963.[1] His status was adjusted to that of a permanent resident on or about April 15, 1965. He thereafter made several trips outside the United States, his returns from which would have posed no problem except for one fact. He was convicted in the United States District Court for the Southern District of New York, of the crime of kidnapping, committed on or about May 26, 1970, in violation of 18 U.S.C. 1201, and sentenced to confinement in a prison or corrective institution for a period of three years.

It is well established and uncontested here that the crime of which the respondent stands convicted involves moral turpitude.[2] Thus, he is deportable if any of the returns he made within five years preceding the commission thereof (1970) constituted an "entry," within the contemplation of section 101(a)(13) of the Immigration and Nationality Act, 8 U.S.C. 1101. These proceedings are predicated on the charge that his return to the United States following a 1967 Canadian sojourn constituted such an "entry." The facts giving rise to that charge can be summarized briefly.

As the result of correspondence between St. Mary's University, Halifax, Nova Scotia, Canada and respondent, he was offered and accepted a contract to teach (lecture) in the Theology Department of that institution for the academic year September 1967—May 1968, inclusive, at a salary of approximately $9,000, plus lodging. The respondent left the United States in the latter part of August of 1967 to fulfill the terms of that contract, which called for him to commence teaching on September 1, 1967. However, differences arose between school officials and the respondent which resulted in the termination of his employment in December of 1967. He returned to the United States through the port of Buffalo, New York, that same month.[3]

With two exceptions, section 101(a)(13) of the Immigration and Nationality Act provides that any coming of an alien from a foreign place, whether it is a first coming or return, is an "entry" subjecting the alien to the exclusion and/or expulsion provisions of

---

[1] He was then a duly ordained Catholic priest.

[2] *Matter of P——*, 5 I. & N. Dec. 444 (BIA, 1953).

[3] See stipulated amendment (hearing, R–20, 21) to factual allegation No. 4, Order to Show Cause, charging entry at an unknown northern border port in April 1968 (respondent apparently made two subsequent brief trips to Halifax in 1968, to pick up belongings and visit friends).

209

the immigration laws. The two exceptions are: (1) a coming following an involuntary departure; (2) a coming following a departure which "was not intended or reasonably to be expected" by the alien. Thus, an alien falling within the exceptions does not make an "entry" upon his return because, under the law, he is regarded as if he had not left the United States.

Viewing the foregoing facts in the light of the usual meaning of the ordinary words appearing in the statute, it would seem at first glance that the respondent's case does not fall within either of the stated exceptions. The record contains not the slightest indication that the respondent's presence in Canada was the result of either coercion or inadvertence. It indicates, rather, that he fully intended and/or reasonably expected to go there. But we cannot dispose of the problem here that simply, because of the 1963 ruling of the Supreme Court of the United States in the case of *Rosenberg* v. *Fleuti*, 374 U.S. 449 (10 L.Ed. 2d 1000, 83 S.Ct. 1804), that the intent exception to section 101(a)(13) means "an intent to depart in a manner which can be regarded as meaningfully interruptive of the alien's permanent residence."

Respondent contends his case falls within the *Fleuti* "intent" rule, *supra*, for the reason that he never intended to abandon his permanent residence in the United States. He argues that: all during the time he was in Canada he was in the process of establishing a mail order export-import business in the United States,[4] in contemplation of leaving the religious life; he had a business address (post office box) in Cambridge, Massachusetts, in connection therewith; he made trips back to the United States from Canada in October and November of 1967, each of about two weeks' duration, to conduct that business—both at his Boston importer's office and in travels around the Eastern United States; on those occasions he stayed at the home of various religious orders where he had lived prior to going to Canada and where he resided between the time of his final return from Canada (footnote 3, *supra*) and his departure from the clerical ranks;[5] and in October of 1967 he notified Service officers at Pittsburgh, Pennsylvania and Boston, Massachusetts of his absence from the United States and his "permanent" United States address. He submits that the fact that his business venture ultimately failed is of no consequence.

While not challenging the respondent's last stated proposition, we reject his basic contention and find wanting his supporting factual argument. In our opinion, "intent to abandon permanent

---

[4] He claimed he also attempted to set up a similar business in Canada during that period, but was unsuccessful.

[5] He was apparently relieved of his priestly obligations in 1970.

resident status" is not synonymous with "intent to depart in a manner which can be regarded as meaningfully interruptive of permanent residence." We are not aware of any judicial decisions equating the two concepts, and respondent has cited none. On the contrary, it has been administratively determined, for reasons which are equally applicable here, that a continuing intent to maintain United States residence is not decisive,[6] but is merely one factor to be considered in determining whether an alien's departure was intended to be meaningfully interruptive of his permanent residence.[7]

We must, therefore, evaluate the foregoing factor together with others which the Supreme Court in *Fleuti, supra,* pointed up as being relevant in determining whether a departure had been intended to be disruptive of residence, to wit: length of the absence, purpose of the visit, need to secure travel documents. In weighing these considerations, we cannot overlook the Court's admonition in *Fleuti, supra,* that "an innocent, casual, and brief excursion by a resident alien outside this country's borders ... may not subject him to the consequences of an 'entry' into the country on his return."

The facts recited above indicate that the respondent may well have had a continuing intent to return to the United States from Canada at all times here pertinent, despite his abortive attempt to set himself up in business there (footnote 4, *supra*). Also, the purpose of his trip was ostensibly bona fide, honorable, lawful, and not necessarily inconsistent with any policy reflected in our immigration laws. Nevertheless, it is our judgment that respondent did make an entry when he returned from Canada in December of 1967.

Well in advance of his August 1967 departure, the respondent made plans to be in Canada for a period of approximately nine months. Obviously, those same plans contemplated his being present there basically all the time during that period. They also involved substantial remuneration for respondent's services. The effect thereof certainly was not materially altered by the unscheduled change in circumstances occurring four months after his departure.

When the respondent departed from the United States, he was inspected by a Canadian immigration officer. To gain admission to Canada, he had to show that officer his "green alien registration card" (Form I–151) and a letter from St. Mary's University concerning his employment. At that time, the officer warned the respondent that if he sold anything in Canada he would have to

[6] *Matter of Guimares,* 10 I. & N. Dec. 529 (BIA, 1964).
[7] See *Bilbao-Bastida v. INS,* 409 F.2d 820 (C.A. 9, 1969).

pay duty on it. After two or three months the respondent had to obtain Canadian license plates for his previously United States registered automobile.

Summarizing briefly, after careful preparation, the respondent departed from the United States to engage in gainful employment in Canada on a full-time basis for an academic year of approximately nine months' duration. The circumstances of his admission to Canada to fulfill that purpose were such as to reasonably have caused him to consider more fully the implications involved in his leaving this country.

On the foregoing bases, we conclude that this case does not involve "an innocent, casual, and brief excursion abroad" by a resident alien, within the scope of the *Fleuti* decision, *supra*. Therefore, we hold that the respondent's departure to Canada in August of 1967 was "meaningfully interruptive" of his resident alien status and did subject him to the consequences of an "entry" upon his return to this country in December of 1967. Accordingly, and in view of the foregoing, the special inquiry officer's order of deportation is affirmed. All we need add is that, as pointed out by the special inquiry officer, the crime of which the respondent stands convicted renders him ineligible for discretionary relief from deportation.

**ORDER:** *It is ordered* that the appeal be and it is hereby dismissed.