**Shrikishan Hiralal JOSHI, Appellant,**

v.

**DISTRICT DIRECTOR, IMMIGRATION AND NATURALIZATION SERVICE, Appellee.**

**No. 83–1614.**

United States Court of Appeals, Fourth Circuit.

Argued Aug. 31, 1983.

Decided Oct. 27, 1983.

Rehearing Denied Dec. 21, 1983.

Charles Gordon, Washington, D.C., for appellant.

James A. Hunolt, Civ. Div., U.S. Dept. of Justice, Washington, D.C. (J. Paul McGrath, Asst. Atty. Gen., Civ. Div., Charles E. Hamilton, III, Asst. Director, Washington, D.C., on brief), for appellee.

Before WINTER, Chief Judge, MURNAGHAN, Circuit Judge, and BUTZNER, Senior Circuit Judge.

BUTZNER, Senior Circuit Judge:

Contending that he was entitled to have his status determined in deportation proceedings, Shrikishan Hiralal Joshi, an alien, appeals from the denial of an application for a writ of habeas corpus in which he challenged a decision of the Board of Immigration Appeals upholding his exclusion from the United States. We reverse the judgment of the district court and direct the entry of a writ declaring the exclusion order invalid and remanding this matter to the Immigration and Naturalization Service for determination in deportation proceedings of the relief Joshi seeks. We express no view on the merits of Joshi's substantive claims.

I

Joshi, a 67-year old citizen of India, was lawfully admitted to the United States in 1973 as a nonimmigrant business visitor. In 1974, he applied to the district director of the Immigration and Naturalization Service for an adjustment of status to that of a permanent resident. In June 1975, while

his application was pending, Joshi sought permission to travel to India on business. The Service granted his request in the form of an "advance parole." Joshi made his business trip and returned six weeks later to resume his application for adjustment of status. This application was denied in 1976. A subsequent application and a motion for reconsideration were also denied.

The Service instituted exclusion proceedings against Joshi in 1978.[1] He objected to the exclusion proceedings as inappropriate and also renewed his application for adjustment to permanent resident status. The immigration judge overruled the objection to the exclusion proceedings. At the conclusion of the hearing in April 1983, she denied Joshi's application for adjustment of status and ordered him excluded from the United States. The judge also denied the discretionary relief that Joshi sought.

The Board of Immigration Appeals rejected Joshi's claim that he should have been accorded deportation rather than exclusion proceedings and dismissed his appeal. It concluded that Joshi lost his right to deportation proceedings when he obtained the first advance parole. The Board also upheld the denial of his request for suspension of deportation, ruling that this relief is "only available in deportation proceedings." It affirmed the denial of other discretionary relief. No precedent precisely on point was available to the Board because Joshi's case appears to be the first to consider the consequences of an alien's authorized departure and return to resume a pending application for change of status.

## II

After Joshi was lawfully admitted to this country as a business nonimmigrant in 1973, he could be removed only by deportation proceedings. He could not be subjected to exclusion proceedings. In 1974 when he applied for permanent residency, his deportable status remained unchanged under a

long-standing administrative practice that regards the applicant's authorized stay in the United States as continuing while his application is under consideration. See INS Operations Instructions 245.5b, reproduced in 4 Gordon & Rosenfield, *Immigration Law and Procedure* 23–530 (1983).

The type of hearing accorded Joshi has far-reaching effects. A deportation hearing is the usual means of proceeding against an alien already physically in the United States; an exclusion hearing is the usual means of proceeding against an alien who is seeking admission. *Landon v. Plasencia*, —— U.S. ——, 103 S.Ct. 321, 325, 74 L.Ed.2d 21 (1982). If Joshi is entitled to deportation proceedings, he would have many substantive and procedural benefits not available to an excludable alien. The Supreme Court has noted that "the alien who loses his right to reside in the United States in a deportation hearing . . . may be able to depart voluntarily, § 244(e), 8 U.S.C. § 1254(e), avoiding . . . the stigma of deportation, § 242(b), 8 U.S.C. § 1252(b) . . . or he can seek suspension of deportation, § 242(e), 8 U.S.C. § 1252(e)." *Landon v. Plasencia*, —— U.S. ——, 103 S.Ct. 321, 326, 74 L.Ed.2d 21 (1982).

## III

Despite Joshi's protestations that he has been denied due process of law because subjecting him to exclusion proceedings is fundamentally unfair, we conclude that resolution of this appeal does not depend on the application of constitutional principles. Instead, it involves interpretation of statutes, regulations, and the Service's operations instructions. Although the appeal presents an issue of first impression, Supreme Court opinions dealing with closely-related matters furnish controlling precedent.

In *Rosenberg v. Fleuti*, 374 U.S. 449, 457–58, 83 S.Ct. 1804, 1809–1810, 10 L.Ed.2d

---

1. While the exclusion proceedings were pending, Joshi was granted two more advance paroles for business and personal reasons. It is undisputed, however, that Joshi's status must be determined on the basis of his 1975 departure and return. His subsequent advance paroles simply referred to him as a respondent in the pending exclusion proceedings. For this reason, they are irrelevant to the determination of this case.

1000 (1963), the Supreme Court noted that Congress, reacting to the narrow judicial interpretation of "entry" when it enacted § 101(a)(13), wanted to ameliorate the harsh results visited upon aliens who had previously entered and resided in the United States.[2] The Court said: "We conclude, then, that it effectuates congressional purpose to construe the intent exception to § 101(a)(13) as meaning an intent to depart in a manner which can be regarded as meaningfully interruptive of the alien's permanent residence." The Court left development of this concept to the judicial process, but in the case at hand, it applied this interpretation of the statute to a resident alien whose departure from the United States "was an innocent, casual and brief excursion." Under these circumstances, the returning alien was not subject to the consequences of entry. Its interpretation of the Act, the Court explained, gave recognition to congressional intent to protect aliens residing in the country from unexpected risks and unintended consequences of wholly innocent action. 374 U.S. at 462, 83 S.Ct. at 1812.

In 1968 the Commissioner issued a regulation, 8 C.F.R. § 245.2(a)(3), which in effect applied the *Fleuti* rationale to the departure of aliens who, like Joshi, are seeking adjustment of status.[3] It is apparent from the text of the regulation that an applicant for adjustment of status who makes an unintended departure from the United States for a brief absence is not deemed to have lost his entitlement to adjudication of his application in deportation proceedings. On this point the regulation is explicit: "[T]he application shall be adjudicated without regard to the departure and absence." The alien is accorded this favorable treatment because, as *Fleuti* explains, the congressional purpose is effectuated by ascertaining whether the alien intended his departure to be "meaningfully interruptive." 374 U.S. at 462, 83 S.Ct. at 1812.

*Fleuti* also teaches that the relevant factors pertaining to an alien's intent should be developed " 'by the gradual process of judicial inclusion and exclusion' ..." 374 U.S. at 462, 83 S.Ct. at 1812. This case, we believe, provides a proper occasion for giving effect to this aspect of *Fleuti*.

Joshi's intent in departing from the United States has never been questioned. He recognized that if he left without permission he would abandon his application for adjustment of status. Consequently, to preserve his application he sought permission. Moreover, he was granted permission by a document that recited in part: "This authorization will permit you to resume your application for adjustment of status on your return to the United States." It is quite clear that Joshi intended to preserve, rather than meaningfully interrupt, his entitlement to a deportation proceeding. We conclude that Joshi's departure, absence, and return pursuant to permission for the express purpose of resuming his application for adjustment of status was "unintended" within the meaning of the regulation as

---

**2.** Section 101(a)(13) of the Act, 8 U.S.C. § 1101(a)(13), defines "entry":

The term "entry" means any coming of an alien into the United States, from a foreign port or place or from an outlying possession, whether voluntarily or otherwise, except that an alien having a lawful permanent residence in the United States shall not be regarded as making an entry into the United States for the purpose of the immigration laws if the alien proves to the satisfaction of the Attorney General that his departure to a foreign port or place or to an outlying possession was not intended or reasonably to be expected by him or his presence in a foreign port or place or in an outlying possession was not voluntary.

**3.** 8 C.F.R. § 245.2(a)(3) provides in part:

The departure of an applicant [for permanent resident status under § 245 of the Act] who is not under deportation proceedings shall be deemed an abandonment of his application constituting grounds for termination thereof unless he had previously been granted permission by the Service for such absence and he was thereafter inspected upon his return, or it is determined by the officer having jurisdiction over his application that his departure was unintended or innocent and casual, that his absence was brief, and that he was inspected upon his return. If the determination reached is favorable to the applicant, the application shall be adjudicated without regard to the departure and absence.

interpreted according to the principles explained in *Fleuti,* 374 U.S. 449, 83 S.Ct. 1804, 10 L.Ed.2d 1000.

Joshi's absence was brief, as well. Under the Service's internal regulations, the adjustment applicant is required to return to the United States within two months of the date the advance authorization form is issued. INS Operations Instruction 212.5c, reproduced in Gordon & Rosenfield, 4 *Immigration Law and Procedure* 23–168.4, 23–171 (1983). Joshi complied with this requirement, returning from India after a six-week absence.

Joshi has satisfied all of the requirements of 8 C.F.R. § 245.2(a)(3). His departure was unintended within the meaning of this regulation. His absence was brief when measured by INS Operations Instruction 212.5c. He was inspected pursuant to § 235, 8 U.S.C. § 1225(a), and allowed to return to the country. Consequently, pursuant to the regulation, his application for adjustment of status should have been "adjudicated without regard to the departure and absence." Joshi was entitled to have his application adjudicated in deportation proceedings before his authorized departure. By the terms of the regulation, he is still entitled to adjudication in deportation proceedings and to the ancillary relief available to those proceedings. The Board erred by sustaining adjudication in exclusionary proceedings.

We do not suggest that Joshi could not have been denied admission to the country upon his return from India in 1975 in an exclusion hearing. He was subject to inspection when he presented himself at the border. Notwithstanding the permission he had received to depart and return, if he had violated any immigration law or if he had misrepresented the purpose of his travel, he would not be entitled to the benefit of 8 C.F.R. § 245.2(a)(3). Moreover, the Service could determine his entitlement in an exclusion hearing. *See Landon v. Plasencia,* —— U.S. ——, 103 S.Ct. 321, 328–29, 74 L.Ed.2d 21 (1982).

## IV

We are not persuaded by the Service's arguments, which were adopted by the Board, that the text of the permission granted Joshi in 1975 and subsequently promulgated regulations dictate a change in his status from an alien subject to deportation to an alien subject to exclusion. The 1975 permission was styled an "advance parole." It stated:

Advance parole authorized for travel to India for business reasons. This authorization will permit you to resume your application for adjustment of status on your return to the United States. However, you will then be considered an applicant for entry and if your adjustment in expulsion proceedings. [sic]

The Service contends that this document clearly notified Joshi that he would be considered a paroled alien and an applicant for entry. Joshi counters by arguing that the reference to "expulsion proceedings" clearly indicates that he would be entitled to a deportation hearing if he passed inspection at the border. Dicta in *Leng May Ma v. Barber,* 357 U.S. 185, 188, 78 S.Ct. 1072, 1074, 2 L.Ed.2d 1246 (1958), appears to support Joshi. There the Court explained:

Chapter 5 [of the Immigration and Nationality Act] concerns itself with aliens who have already entered the United States and are subject to "expulsion," as distinguished from "exclusion," if they fall within certain "general classes of deportable aliens." 66 Stat. 204, 8 U.S.C. § 1251. Proceedings for expulsion under Chapter 5 are commonly referred to as "deportation proceedings."

Nevertheless, discussion of the printed form and the nomenclature adopted by the Service in granting permission pursuant to 8 C.F.R. § 245.2(a)(3) need not long *detain* us. The form is unintelligible, and we believe the outcome of this appeal should not depend on what at best would be a labored interpretation of it. It is sufficient to note that the form did not notify Joshi that departure, travel, and return pursuant to the advance parole would result in the loss of entitlement to a deportation proceeding. Quite wisely, the Service revised the form

in 1979 to delete the garbled language about entry and expulsion.[4]

Advance parole is not a statutory procedure. Nor is its use stipulated by 8 C.F.R. § 245.2(a)(3) which speaks only of permission for the alien's absence. Advance parole is simply an administrative device that until 1978 had been regulated solely by INS operation instructions that used this nomenclature interchangeably with "advanced authorization." *See, e.g.,* Operation Instruction 212.5c, reproduced in 4 Gordon & Rosenfield, *Immigration Law and Procedure* 23–168.4 (1983). In 1978, the Service promulgated 8 C.F.R. §§ 236.4 and 245.2(a)(1). These regulations provide that an adjustment applicant who is "an alien paroled under section 212(d)(5) of the Act" may renew his application in an exclusion proceeding if he satisfies certain requirements.[5]

The difficulty with the Board's reliance on the 1978 regulations lies in the fact that the regulations pertain to "an alien paroled under section 212(d)(5) of the Act." But Joshi was never paroled under this section.

Section 212(d)(5) authorizes the Attorney General to parole into the United States temporarily aliens who arrive at the border seeking admission. The law was enacted to allow the applicant entry "for emergent reasons or for reasons deemed strictly in the public interest."[6] Although the paroled alien is physically present in the United States, he is characterized as stopped at the gates. *See Kaplan v. Tod,* 267 U.S. 228, 230, 45 S.Ct. 257, 257–258, 69 L.Ed. 585 (1925). Congress specifically provided that the parole "shall not be regarded as an admission of the alien" and when the parole is terminated, "his case shall continue to be dealt with in the same manner as that of any other applicant for admission into the United States."

Section 212(d)(5), however, does not address the consequences of departure and return of an alien in Joshi's situation. Joshi's admission to the country after his business trip was not for "emergent reasons or for reasons deemed strictly in the public interest" as specified by § 212(d)(5).[7] His

---

**4.** Current INS operation instructions direct that the following language be included in the parole authorization form: "This authorization will permit you to resume your application for adjustment of status on your return to the United States." INS Operation Instruction 212.5c, reproduced in 4 Gordon & Rosenfield, *Immigration Law and Procedure* 23–168.4, 23–171 (1983).

**5.** 8 C.F.R. § 236.4 (1983) provides:

An adjustment application by an alien paroled under section 212(d)(5) of the Act, which has been denied by the district director, may be renewed in exclusion proceedings under section 236 of the Act before an immigration judge under the following two conditions: First, the denied application must have been properly filed subsequent to the applicant's earlier inspection and admission to the United States; second, the applicant's later absence from and return to the United States must have been under the terms of an advance parole authorization on Form I–512 granted to permit the applicant's absence and return to pursue the previously filed adjustment application.

Substantially similar language appears in 8 C.F.R. § 245.2(a)(1) (1983).

**6.** Section 212(d)(5), 8 U.S.C. § 1182(d)(5), provides:

(5) The Attorney General may ... in his discretion parole into the United States temporarily under such conditions as he may prescribe for emergent reasons or for reasons deemed strictly in the public interest any alien applying for admission to the United States, but such parole of such alien shall not be regarded as an admission of the alien and when the purposes of such parole shall, in the opinion of the Attorney General, have been served the alien shall forthwith return or be returned to the custody from which he was paroled and thereafter his case shall continue to be dealt with in the same manner as that of any other applicant for admission to the United States.

**7.** The legislative history of the parole statute discloses what Congress intended this phrase to mean:

The committee believes that the broader discretionary authority [in § 212(d)(5)] is necessary to permit the Attorney General to parole inadmissible aliens into the United States in emergency cases, such as the case of an alien who requires immediate medical attention before there has been an opportunity for an immigration officer to inspect him, and in cases where it is strictly in the public interest to have an inadmissible alien present in the United States, such as, for instance, a

advance parole was in reality a form of permission granted pursuant to 8 C.F.R. § 245.2(a)(3) authorizing him to travel to India and upon his return to resume his application for a change of status. Even though the Service called this permission an advance parole, we believe its consequences should not be dictated by literal application of § 212(d)(5) which does not purport to deal with authorization for foreign travel or with readmittance to the country to resume prosecution of a pending motion.

A realistic reading of the 1978 regulations, 8 C.F.R. §§ 236.4 and 245.2(a)(1), is that the references to renewal of adjustment applications in exclusion proceedings by persons granted advance parole applies only to aliens who were previously in a § 212(d)(5) parole status or who have been granted advance parole prior to their initial entry into the United States.[8] This interpretation of the regulations is consistent with 8 C.F.R. § 245.2(a)(3) requiring the adjustment application be adjudicated "without regard to the departure and absence" if the alien is favorably readmitted to the United States. Thus, if an applicant was deportable before his authorized absence, he remains deportable after he passes inspection upon his return. If an applicant was excludable before the departure because he is a § 212(d)(5) parolee, he would continue in an excludable status after his return even if he is allowed to come into the country to resume his application.

## V

In sum, we conclude that an alien who seeks permission to travel and return to the United States pursuant to 8 C.F.R. § 245.-2(a)(3) should be given the same consideration afforded similarly situated aliens who are favorably readmitted to the country after leaving without permission. In both instances, their applications for status adjustment should be adjudicated without re-

gard to departure and absence. We therefore hold that when Joshi returned from his business trip and was readmitted to the United States after inspection, his application should have been adjudicated in deportation proceedings. This conclusion is consistent with 8 C.F.R. § 245.2(a)(3) which deals with the departure and return of aliens seeking an adjustment of status. It is consistent also with the principles that undergird the Supreme Court's decision in *Rosenberg v. Fleuti*, 374 U.S. 449, 83 S.Ct. 1804, 10 L.Ed.2d 1000 (1983).

Joshi urges us to render a favorable decision on his substantive claims. We decline to do this. Our decision is limited solely to the procedural aspects of his case. We hold only that on remand his substantive claims, including his requests for discretionary relief, should be adjudicated in deportation proceedings and not in exclusion proceedings.

The judgment of the district court is vacated, and this case is remanded for further judicial and administrative proceedings consistent with this opinion.

---

witness or for purposes of prosecution. H.R. Rep. No. 1365, 82d Cong., 2d Sess. 52, *reprinted in* 1952 U.S.Code Cong. & Ad.News 1653, 1706.

8. INS Operation Instruction 212.5c, reproduced in 4 Gordon & Rosenfield, *Immigration Law and Procedure* 23–168.4, 23–170 (1983), authorizes the use of advance parole in these situations.