(Slip Opinion)          OCTOBER  TERM,  2011                    1

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is
being done in connection with this case, at the time the opinion is issued.
The syllabus constitutes no part of the opinion of the Court but has been
prepared by the Reporter of Decisions for the convenience of the reader.
See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## VARTELAS *v.* HOLDER, ATTORNEY GENERAL

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT

No. 10–1211.   Argued January 18, 2012—Decided March 28, 2012

Before passage of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA), United States immigration law provided deportation hearings for excludable aliens who had already entered the United States and exclusion hearings for excludable aliens seeking entry into the United States.  Lawful permanent residents were not regarded as making an "entry," upon their return from "innocent, casual, and brief excursion[s] . . . outside this country's borders."  *Rosenberg* v. *Fleuti*, 374 U. S. 449, 462.  In IIRIRA, Congress abolished the distinction between exclusion and deportation procedures, creating a uniform "removal" proceeding.  See 8 U. S. C. §§1229, 1229a.  Congress made "admission" the key word, and defined "admission" to mean "the lawful entry of the alien into the United States after inspection and authorization by an immigration officer."  §1101(a)(13)(A).  This alteration, the Board of Immigration Appeals (BIA) determined, superseded *Fleuti*.  Thus, lawful permanent residents returning from a trip abroad are now regarded as seeking admission if they have "committed an offense identified in section 1182(a)(2)," §1101(a)(13)(C)(v), including, as relevant here, "a crime involving moral turpitude . . . or conspiracy to commit such a crime," §1182(a)(2)(A)(i).

Petitioner Vartelas, a lawful permanent resident of the United States since 1989, pleaded guilty to a felony (conspiring to make a counterfeit security) in 1994, and served a 4-month prison sentence. In the years after his conviction, and even after IIRIRA's passage, Vartelas regularly traveled to Greece to visit his aging parents.  In 2003, when Vartelas returned from a week-long trip to Greece, an immigration officer classified him as an alien seeking "admission" based on his 1994 conviction.  At Vartelas' removal proceedings, his

attorneys conceded removability and requested discretionary relief
under former §212(c) of the Immigration and Nationality Act.  The
Immigration Judge denied the request for relief, and ordered Var-
telas removed to Greece.  The BIA affirmed.  In 2008, Vartelas filed
with the BIA a timely motion to reopen the removal proceedings, al-
leging that his previous attorneys were ineffective for, among other
lapses, conceding his removability.  He sought to withdraw the con-
cession of removability on the ground that IIRIRA's new "admission"
provision did not reach back to deprive him of lawful resident status
based on his pre-IIRIRA conviction.  The BIA denied the motion.  The
Second Circuit affirmed.  Rejecting Vartelas' argument that IIRIRA
operated prospectively and therefore did not govern his case, the Se-
cond Circuit reasoned that he had not relied on the prior legal regime
at the time he committed the disqualifying crime.

*Held:* The impact of Vartelas' brief travel abroad on his permanent res-
ident status is determined not by IIRIRA, but by the legal regime in
force at the time of his conviction.  Pp. 7–17.

   (a) Under the principle against retroactive legislation invoked by
Vartelas, courts read laws as prospective in application unless Con-
gress has unambiguously instructed retroactivity.  See *Landgraf* v.
*USI Film Products*, 511 U. S. 244, 263.  The presumption against ret-
roactive legislation "embodies a legal doctrine centuries older than
our Republic."  *Id.*, at 265.  Numerous decisions of this Court have
invoked Justice Story's formulation for determining when a law's ret-
rospective application would collide with the doctrine, namely, as rel-
evant here, when such application would "attac[h] a new disability, in
respect to transactions or considerations already past," *Society for
Propagation of Gospel* v. *Wheeler*, 22 F. Cas. 756, 767.  See, *e.g., INS*
v. *St. Cyr*, 533 U. S. 289, 321; *Hughes Aircraft Co.* v. *United States ex
rel. Schumer*, 520 U. S. 939, 947; *Landgraf,* 511 U. S., at 283.  Var-
telas urges that applying IIRIRA to him would attach a "new disabil-
ity," effectively a ban on travel outside the United States, "in respect
to" past events, specifically, his offense, guilty plea, conviction, and
punishment, all occurring prior to IIRIRA's passage.

   Congress did not expressly prescribe §1101(a)(13)'s temporal reach.
The Court, therefore, proceeds to the dispositive question whether
application of IIRIRA's travel restraint to Vartelas "would have ret-
roactive effect" Congress did not authorize.  See *id.,* at 280.  Vartelas
presents a firm case for application of the antiretroactivity principle.
Beyond genuine doubt §1101(a)(13)(C)(v)'s restraint on lawful per-
manent residents like Vartelas ranks as a "new disability."  Once
able to journey abroad to, *e.g.,* fulfill religious obligations or respond
to family emergencies, they now face potential banishment, a severe
sanction.  See, *e.g., Padilla* v. *Kentucky*, 559 U. S. ___, ___.  The Gov-

ernment suggests that Vartelas could have avoided any adverse consequences if he simply stayed at home in the United States. But losing the ability to travel abroad is itself a harsh penalty, made all the more devastating if it means enduring separation from close family members.

This Court has rejected arguments for retroactivity in similar cases, see *Chew Heong* v. *United States*, 112 U. S. 536, 559; *St. Cyr*, 533 U. S., at 321–323, and in cases in which the loss at stake was less momentous, see *Landgraf*, 511 U. S., at 280–286; *Hughes Aircraft,* 520 U. S., at 946–950. Pp. 7–11.

(b) The Court finds disingenuous the Government's argument that no retroactive effect is involved in this case because the relevant event is the alien's post-IIRIRA return to the United States. Vartelas' return occasioned his treatment as a new entrant, but the reason for his "new disability" was his pre-IIRIRA conviction. That past misconduct is the wrongful activity targeted by §1101(a)(13)(C)(v). Pp. 11–13.

(c) In determining that the change IIRIRA wrought had no retroactive effect, the Second Circuit homed in on the words "committed an offense" in §1101(a)(13)(C)(v). It reasoned that reliance on the prior law is essential to application of the antiretroactivity principle, and that Vartelas did not commit his crime in reliance on immigration laws. This reasoning is doubly flawed. A party is not required to show reliance on the prior law in structuring his conduct. See, *e.g., Landgraf*, 511 U. S., at 282, n. 35. In any event, Vartelas likely relied on then-existing immigration law, and this likelihood strengthens the case for reading a newly enacted law prospectively. *St. Cyr* is illustrative. There, a lawful permanent resident pleaded guilty to a criminal charge that made him deportable. Under the immigration law in effect when he was convicted, he would have been eligible to apply for a waiver of deportation. But his removal proceeding was commenced after IIRIRA withdrew that dispensation. Disallowance of discretionary waivers attached a new disability to past conduct, 533 U. S., at 321. Aliens like St. Cyr "almost certainly relied upon th[e] likelihood [of receiving discretionary relief] in deciding [to plead guilty, thereby] forgo[ing] their right to a trial," *id.*, at 325. Because applying the IIRIRA withdrawal to St. Cyr would have an "obvious and severe retroactive effect," *ibid.*, and Congress made no such intention plain, *ibid.*, n. 55, the prior law governed St. Cyr's case. Vartelas' case is at least as clear as St. Cyr's for declining to apply a new law retroactively. St. Cyr could seek only the Attorney General's *discretionary* dispensation, while Vartelas, under *Fleuti*, was free, without seeking an official's permission, to make short trips to see and assist his parents in Greece. The Second Circuit compounded its initial

misperception of the antiretroactivity principle by holding otherwise. *Fleuti* continues to govern Vartelas' short-term travel.  Pp. 14–17.

620 F. 3d 108, reversed and remanded.

GINSBURG, J., delivered the opinion of the Court, in which ROBERTS, C. J., and KENNEDY, BREYER, SOTOMAYOR, and KAGAN, JJ., joined. SCALIA, J., filed a dissenting opinion, in which THOMAS and ALITO, JJ., joined.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

_____

No. 10–1211

_____

## PANAGIS VARTELAS, PETITIONER *v.* ERIC H. HOLDER, JR., ATTORNEY GENERAL

### ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT

[March 28, 2012]

JUSTICE GINSBURG delivered the opinion of the Court.

Panagis Vartelas, a native of Greece, became a lawful permanent resident of the United States in 1989. He pleaded guilty to a felony (conspiring to make a counterfeit security) in 1994, and served a prison sentence of four months for that offense. Vartelas traveled to Greece in 2003 to visit his parents. On his return to the United States a week later, he was treated as an inadmissible alien and placed in removal proceedings. Under the law governing at the time of Vartelas' plea, an alien in his situation could travel abroad for brief periods without jeopardizing his resident alien status. See 8 U. S. C. §1101(a)(13) (1988 ed.), as construed in *Rosenberg* v. *Fleuti*, 374 U. S. 449 (1963).

In 1996, Congress enacted the Illegal Immigration Reform and Immigrant Responsibility Act (IIRIRA), 110 Stat. 3009–546. That Act effectively precluded foreign travel by lawful permanent residents who had a conviction like Vartelas'. Under IIRIRA, such aliens, on return from a sojourn abroad, however brief, may be permanently removed from the United States. See 8 U. S. C.

§1101(a)(13)(C)(v); §1182(a)(2).

This case presents a question of retroactivity not addressed by Congress: As to a lawful permanent resident convicted of a crime before the effective date of IIRIRA, which regime governs, the one in force at the time of the conviction, or IIRIRA? If the former, Vartelas' brief trip abroad would not disturb his lawful permanent resident status. If the latter, he may be denied reentry. We conclude that the relevant provision of IIRIRA, §1101(a)(13)(C)(v), attached a new disability (denial of reentry) in respect to past events (Vartelas' pre-IIRIRA offense, plea, and conviction). Guided by the deeply rooted presumption against retroactive legislation, we hold that §1101(a)(13)(C)(v) does not apply to Vartelas' conviction. The impact of Vartelas' brief travel abroad on his permanent resident status is therefore determined not by IIRIRA, but by the legal regime in force at the time of his conviction.

I

A

Before IIRIRA's passage, United States immigration law established "two types of proceedings in which aliens can be denied the hospitality of the United States: deportation hearings and exclusion hearings." *Landon* v. *Plasencia*, 459 U. S. 21, 25 (1982). Exclusion hearings were held for certain aliens seeking entry to the United States, and deportation hearings were held for certain aliens who had already entered this country. See *ibid.*

Under this regime, "entry" into the United States was defined as "any coming of an alien into the United States, from a foreign port or place." 8 U. S. C. §1101(a)(13) (1988 ed.). The statute, however, provided an exception for lawful permanent residents; aliens lawfully residing here were not regarded as making an "entry" if their "departure to a foreign port or place . . . was not intended or reasona-

bly to be expected by [them] or [their] presence in a foreign port or place . . . was not voluntary." *Ibid.* Interpreting this cryptic provision, we held in *Fleuti*, 374 U. S., at 461–462, that Congress did not intend to exclude aliens long resident in the United States upon their return from "innocent, casual, and brief excursion[s] . . . outside this country's borders." Instead, the Court determined, Congress meant to rank a once-permanent resident as a new entrant only when the foreign excursion "meaningfully interrupt[ed] . . . the alien's [U. S.] residence." *Id.,* at 462. Absent such "disrupti[on]" of the alien's residency, the alien would not be "subject . . . to the consequences of an 'entry' into the country on his return." *Ibid.*[1]

In IIRIRA, Congress abolished the distinction between exclusion and deportation procedures and created a uniform proceeding known as "removal." See 8 U. S. C. §§1229, 1229a; *Judulang* v. *Holder*, 565 U. S. \_\_\_, \_\_\_ (2011) (slip op., at 1–2). Congress made "admission" the key word, and defined admission to mean "the lawful entry of the alien into the United States after inspection and authorization by an immigration officer." §1101(a)(13)(A). This alteration, the Board of Immigration Appeals (BIA) determined, superseded *Fleuti*. See *In re Collado-Munoz*, 21 I. & N. Dec. 1061, 1065–1066 (1998) (en banc).[2] Thus, lawful permanent residents returning

_____

[1] The dissent appears driven, in no small measure, by its dim view of the Court's opinion in *Fleuti*. See *post*, at 6 ("same instinct" operative in *Fleuti* and this case).

[2] The BIA determined that the *Fleuti* doctrine no longer held sway because it was rooted in the "no longer existent definition of 'entry' in [the INA]." 21 I. & N. Dec., at 1065. The Board also noted that "Congress . . . amended the law to expressly preserve some, but not all, of the *Fleuti* doctrine" when it provided that a lawful permanent resident absent from the United States for less than 180 days would not be regarded as seeking an admission except in certain enumerated circumstances, among them, prior commission of a crime of moral turpitude. See *ibid.* (citing 8 U. S. C. §1101(a)(13)(C)(ii)).

post-IIRIRA, like Vartelas, may be required to "'see[k] an admission' into the United States, without regard to whether the alien's departure from the United States might previously have been ranked as 'brief, casual, and innocent' under the Fleuti doctrine." *Id.*, at 1066.

An alien seeking "admission" to the United States is subject to various requirements, see, *e.g.*, §1181(a), and cannot gain entry if she is deemed "inadmissible" on any of the numerous grounds set out in the immigration statutes, see §1182. Under IIRIRA, lawful permanent residents are regarded as seeking admission into the United States if they fall into any of six enumerated categories. §1101(a)(13)(C). Relevant here, the fifth of these categories covers aliens who "ha[ve] committed an offense identified in section 1182(a)(2) of this title." §1101(a)(13)(C)(v). Offenses in this category include "a crime involving moral turpitude (other than a purely political offense) or an attempt or conspiracy to commit such a crime." §1182(a)(2)(A)(i).

In sum, before IIRIRA, lawful permanent residents who had committed a crime of moral turpitude could, under the *Fleuti* doctrine, return from brief trips abroad without applying for admission to the United States. Under IIRIRA, such residents are subject to admission procedures, and, potentially, to removal from the United States on grounds of inadmissibility.[3]

––––––––––

Vartelas does not challenge the ruling in *Collado-Munoz*. We therefore assume, but do not decide, that IIRIRA's amendments to §1101(a)(13)(A) abrogated *Fleuti*.

[3] Although IIRIRA created a uniform removal procedure for both excludable and deportable aliens, the list of criminal offenses that subject aliens to exclusion remains separate from the list of offenses that render an alien deportable. These lists are "sometimes overlapping and sometimes divergent." *Judulang* v. *Holder*, 565 U. S. ___, ___ (2011) (slip op., at 2). Pertinent here, although a single crime involving moral turpitude may render an alien inadmissible, it would not render her deportable. See 8 U. S. C. §1182(a)(2) (listing excludable crimes);

## B

Panagis Vartelas, born and raised in Greece, has resided in the United States for over 30 years. Originally admitted on a student visa issued in 1979, Vartelas became a lawful permanent resident in 1989. He currently lives in the New York area and works as a sales manager for a roofing company.

In 1992, Vartelas opened an auto body shop in Queens, New York. One of his business partners used the shop's photocopier to make counterfeit travelers' checks. Vartelas helped his partner perforate the sheets into individual checks, but Vartelas did not sell the checks or receive any money from the venture. In 1994, he pleaded guilty to conspiracy to make or possess counterfeit securities, in violation of 18 U. S. C. §371. He was sentenced to four months' incarceration, followed by two years' supervised release.

Vartelas regularly traveled to Greece to visit his aging parents in the years after his 1994 conviction; even after the passage of IIRIRA in 1996, his return to the United States from these visits remained uneventful. In January 2003, however, when Vartelas returned from a week-long trip to Greece, an immigration officer classified him as an alien seeking "admission." The officer based this classification on Vartelas' 1994 conviction. See *United States ex rel. Volpe* v. *Smith*, 289 U. S. 422, 423 (1933) (counterfeiting ranks as a crime of moral turpitude).

At Vartelas' removal proceedings, his initial attorney conceded removability, and requested discretionary relief from removal under the former §212(c) of the Immigration and Nationality Act (INA). See 8 U. S. C. §1182(c) (1994 ed.) (repealed 1996). This attorney twice failed to appear for hearings and once failed to submit a requested brief. Vartelas engaged a new attorney, who continued to con-

_____

§1227(a)(2) (listing deportable crimes).

cede removability and to request discretionary relief. The
Immigration Judge denied the request for relief, and
ordered Vartelas removed to Greece. The BIA affirmed
the Immigration Judge's decision.

In July 2008, Vartelas filed with the BIA a timely mo-
tion to reopen the removal proceedings, alleging that his
previous attorneys were ineffective for, among other
lapses, conceding his removability. He sought to withdraw
the concession of removability on the ground that IIRIRA's
new "admission" provision, codified at §1101(a)(13), did
not reach back to deprive him of lawful resident status
based on his pre-IIRIRA conviction. The BIA denied the
motion, declaring that Vartelas had not been prejudiced by
his lawyers' performance, for no legal authority prevented
the application of IIRIRA to Vartelas' pre-IIRIRA conduct.

The U. S. Court of Appeals for the Second Circuit af-
firmed the BIA's decision, agreeing that Vartelas had
failed to show he was prejudiced by his attorneys' alleged-
ly ineffective performance. Rejecting Vartelas' argument
that IIRIRA operated prospectively and therefore did not
govern his case, the Second Circuit reasoned that he had
not relied on the prior legal regime at the time he commit-
ted the disqualifying crime. See 620 F. 3d 108, 118–120
(2010).

In so ruling, the Second Circuit created a split with two
other Circuits. The Fourth and Ninth Circuits have held
that the new §1101(a)(13) may not be applied to lawful
permanent residents who committed crimes listed in
§1182 (among them, crimes of moral turpitude) prior to
IIRIRA's enactment. See *Olatunji* v. *Ashcroft*, 387 F. 3d
383 (CA4 2004); *Camins* v. *Gonzales*, 500 F. 3d 872 (CA9
2007). We granted certiorari, 564 U. S. ___ (2011), to
resolve the conflict among the Circuits.

## II

As earlier explained, see *supra*, at 2–4, pre-IIRIRA, a

resident alien who once committed a crime of moral turpitude could travel abroad for short durations without jeopardizing his status as a lawful permanent resident. Under IIRIRA, on return from foreign travel, such an alien is treated as a new arrival to our shores, and may be removed from the United States. Vartelas does not question Congress' authority to restrict reentry in this manner. Nor does he contend that Congress could not do so retroactively. Instead, he invokes the principle against retroactive legislation, under which courts read laws as prospective in application unless Congress has unambiguously instructed retroactivity. See *Landgraf* v. *USI Film Products*, 511 U. S. 244, 263 (1994).

The presumption against retroactive legislation, the Court recalled in *Landgraf*, "embodies a legal doctrine centuries older than our Republic." *Id.*, at 265. Several provisions of the Constitution, the Court noted, embrace the doctrine, among them, the *Ex Post Facto* Clause, the Contract Clause, and the Fifth Amendment's Due Process Clause. *Id.*, at 266. Numerous decisions of this Court repeat the classic formulation Justice Story penned for determining when retrospective application of a law would collide with the doctrine. It would do so, Story stated, when such application would "tak[e] away or impai[r] vested rights acquired under existing laws, or creat[e] a new obligation, impos[e] a new duty, or attac[h] a new disability, in respect to transactions or considerations already past." *Society for Propagation of Gospel* v. *Wheeler*, 22 F. Cas. 756, 767 (No. 13,156) (CC NH 1814). See, *e.g.*, *INS* v. *St. Cyr*, 533 U. S. 289, 321 (2001) (invoking Story's formulation); *Hughes Aircraft Co.* v. *United States ex rel. Schumer*, 520 U. S. 939, 947 (1997); *Landgraf*, 511 U. S., at 283.[4]

_____

[4] The dissent asserts that Justice Story's opinion "bear[s] no relation to the presumption against retroactivity." *Post*, at 6. That is a bold

Vartelas urges that applying IIRIRA to him, rather than the law that existed at the time of his conviction, would attach a "new disability," effectively a ban on travel outside the United States, "in respect to [events] . . . already past," *i.e.*, his offense, guilty plea, conviction, and punishment, all occurring prior to the passage of IIRIRA. In evaluating Vartelas' argument, we note first a matter not disputed by the Government: Congress did not expressly prescribe the temporal reach of the IIRIRA provision in question, 8 U. S. C. §1101(a)(13). See *Landgraf*, 511 U. S., at 280 (Court asks first "whether Congress has expressly prescribed [new §1101(a)(13)'s] proper reach"); Brief for Respondent 11 (Court's holding in *INS* v. *St. Cyr*, 533 U. S., at 317–320, "compels the conclusion that Congress has not 'expressly prescribed the statute's proper reach'" (quoting *Landgraf*, 511 U. S., at 280)).[5] Several other provisions of IIRIRA, in contrast to §1101(a)(13), expressly direct retroactive application, *e.g.*, 8 U. S. C. §1101(a)(43) (IIRIRA's amendment of the "aggravated felony" definition applies expressly to "conviction[s] . . . entered before, on, or after" the statute's enactment date (internal quotation marks omitted)). See *St. Cyr*, 533 U. S., at 319–320, and n. 43 (setting out further examples). Accordingly, we proceed to the dispositive question whether, as Vartelas maintains, application of IIRIRA's travel restraint to him "would have retroactive effect" Congress did not authorize. See *Landgraf*, 511 U. S., at 280.

Vartelas presents a firm case for application of the antiretroactivity principle. Neither his sentence, nor the

_____

statement in view of this Court's many references to Justice Story's formulation in cases involving the presumption that statutes operate only prospectively in the absence of a clear congressional statement to the contrary.

[5] In *St. Cyr*, 533 U. S., at 317–320, we rejected the Government's contention that Congress directed retroactive application of IIRIRA in its entirety.

immigration law in effect when he was convicted and sentenced, blocked him from occasional visits to his parents in Greece. Current §1101(a)(13)(C)(v), if applied to him, would thus attach "a new disability" to conduct over and done well before the provision's enactment.

Beyond genuine doubt, we note, the restraint §1101(a)(13)(C)(v) places on lawful permanent residents like Vartelas ranks as a "new disability." Once able to journey abroad to fulfill religious obligations, attend funerals and weddings of family members, tend to vital financial interests, or respond to family emergencies, permanent residents situated as Vartelas is now face potential banishment. We have several times recognized the severity of that sanction. See, *e.g., Padilla* v. *Kentucky*, 559 U. S. ___, ___ (2010) (slip op., at 8–9, 16).

It is no answer to say, as the Government suggests, that Vartelas could have avoided any adverse consequences if he simply stayed at home in the United States, his residence for 24 years prior to his 2003 visit to his parents in Greece. See Brief in Opposition 13 (Vartelas "could have avoided the application of the statute . . . [by] refrain[ing] from departing from the United States (or from returning to the United States)."); *post*, at 3. Loss of the ability to travel abroad is itself a harsh penalty,[6] made all the more devastating if it means enduring separation from close family members living abroad. See Brief for Asian American Justice Center et al. as *Amici Curiae* 16–23 (describing illustrative cases). We have rejected arguments for retroactivity in similar cases, and in cases in which the

―――――――――

[6] See *Kent* v. *Dulles*, 357 U. S. 116, 126 (1958) ("Freedom of movement across frontiers . . . may be as close to the heart of the individual as the choice of what he eats, or wears, or reads."); *Aptheker* v. *Secretary of State*, 378 U. S. 500, 519–520 (1964) (Douglas, J., concurring) (right to travel, "at home and abroad, is important for . . . business[,] . . . cultural, political, and social activities—for all the commingling which gregarious man enjoys").

loss at stake was less momentous.

In *Chew Heong* v. *United States*, 112 U. S. 536 (1884), a pathmarking decision, the Court confronted the "Chinese Restriction Act," which barred Chinese laborers from reentering the United States without a certificate issued on their departure. The Court held the reentry bar inapplicable to aliens who had left the country prior to the Act's passage and tried to return afterward without a certificate. The Act's text, the Court observed, was not "so clear and positive as to leave no room to doubt [retroactive application] was the intention of the legislature." *Id.*, at 559.

In *Landgraf*, the question was whether an amendment to Title VII's ban on employment discrimination authorizing compensatory and punitive damages applied to pre-enactment conduct. The Court held it did not. No doubt the complaint against the employer charged discrimination that violated the Act at the time it occurred. But compensatory and punitive damages were not then available remedies. The later provision for such damages, the Court determined, operated prospectively only, and did not apply to employers whose discriminatory conduct occurred prior to the amendment. See 511 U. S., at 280–286. And in *Hughes Aircraft*, the Court held that a provision removing an affirmative defense to *qui tam* suits did not apply to pre-enactment fraud. As in *Landgraf*, the provision attached "a new disability" to past wrongful conduct and therefore could not apply retrospectively unless Congress clearly manifested such an intention. *Hughes Aircraft*, 520 U. S., at 946–950.

Most recently, in *St. Cyr*, the Court took up the case of an alien who had entered a plea to a deportable offense. At the time of the plea, the alien was eligible for discretionary relief from deportation. IIRIRA, enacted after entry of the plea, removed that eligibility. The Court held that the IIRIRA provision in point could not be applied to

the alien, for it attached a "new disability" to the guilty plea and Congress had not instructed such a result. 533 U. S., at 321–323.

## III

The Government, echoed in part by the dissent, argues that no retroactive effect is involved in this case, for the Legislature has not attached any disability to past conduct. Rather, it has made the relevant event the alien's post-IIRIRA act of returning to the United States. See Brief for Respondent 19–20; *post*, at 3. We find this argument disingenuous. Vartelas' return to the United States occasioned his treatment as a new entrant, but the reason for the "new disability" imposed on him was not his lawful foreign travel. It was, indeed, his conviction, pre-IIRIRA, of an offense qualifying as one of moral turpitude. That past misconduct, in other words, not present travel, is the wrongful activity Congress targeted in §1101(a)(13)(C)(v).

The Government observes that lower courts have upheld Racketeer Influenced and Corrupt Organizations Act prosecutions that encompassed pre-enactment conduct. See Brief for Respondent 18 (citing *United States* v. *Brown*, 555 F. 2d 407, 416–417 (CA5 1977), and *United States* v. *Campanale*, 518 F. 2d 352, 364–365 (CA9 1975) *(per curiam)*). But those prosecutions depended on criminal activity, *i.e.*, an act of racketeering occuring *after* the provision's effective date. Section 1101(a)(13)(C)(v), in contrast, does not require any showing of criminal conduct postdating IIRIRA's enactment.

*Fernandez-Vargas* v. *Gonzales*, 548 U. S. 30 (2006), featured by the Government and the dissent, Brief for Respondent 17, 36–37; *post*, at 3, is similarly inapposite. That case involved 8 U. S. C. §1231(a)(5), an IIRIRA addition, which provides that an alien who reenters the United States after having been removed can be removed again under the same removal order. We held that the provision

could be applied to an alien who reentered illegally before IIRIRA's enactment. Explaining the Court's decision, we said: "[T]he conduct of remaining in the country . . . is the predicate action; the statute applies to stop *an indefinitely continuing violation . . . .* It is therefore the alien's choice *to continue his illegal presence . . . after* the effective date of the new la[w] that subjects him to the new . . . legal regime, not a past act that he is helpless to undo." 548 U. S., at 44 (emphasis added). Vartelas, we have several times stressed, engaged in no criminal activity after IIRIRA's passage. He simply took a brief trip to Greece, anticipating a return without incident as in past visits to his parents. No "indefinitely continuing" crime occurred; instead, Vartelas was apprehended because of a pre-IIRIRA crime he was "helpless to undo." *Ibid.*

The Government further refers to lower court decisions in cases involving 18 U. S. C. §922(g), which prohibits the possession of firearms by convicted felons. Brief for Respondent 18–19 (citing *United States* v. *Pfeifer*, 371 F. 3d 430, 436 (CA8 2004), and *United States* v. *Hemmings*, 258 F. 3d 587, 594 (CA7 2001)). "[L]ongstanding prohibitions on the possession of firearms by felons," *District of Columbia* v. *Heller*, 554 U. S. 570, 626 (2008), however, target a present danger, *i.e.*, the danger posed by felons who bear arms. See, *e.g.*, *Pfeifer*, 371 F. 3d, at 436 (hazardous conduct that statute targets "occurred after enactment of the statute"); Omnibus Crime Control and Safe Streets Act of 1968, §1201, 82 Stat. 236 (noting hazards involved when felons possess firearms).[7]

_____

[7] The dissent, see *post*, at 6, notes two statutes of the same genre: laws prohibiting persons convicted of a sex crime against a victim under 16 years of age from working in jobs involving frequent contact with minors, and laws prohibiting a person "who has been adjudicated as a mental defective or who has been committed to a mental institution" from possessing guns, 18 U. S. C. §922(g)(4). The dissent is correct that these statutes do not operate retroactively. Rather, they

Nor do recidivism sentencing enhancements support the Government's position. Enhanced punishment imposed for the later offense "'is not to be viewed as . . . [an] additional penalty for the earlier crimes,' but instead, as a 'stiffened penalty for the latest crime, which is considered to be an aggravated offense because [it is] a repetitive one.'" *Witte* v. *United States*, 515 U. S. 389, 400 (1995) (quoting *Gryger* v. *Burke*, 334 U. S. 728, 732 (1948)). In Vartelas' case, however, there is no "aggravated . . . repetitive" offense. There is, in contrast, no post-IIRIRA criminal offense at all. Vartelas' travel abroad and return are "innocent" acts, see *Fleuti*, 374 U. S., at 462, burdened only because of his pre-IIRIRA offense.

In sum, Vartelas' brief trip abroad post-IIRIRA involved no criminal infraction. IIRIRA disabled him from leaving the United States and returning as a lawful permanent resident. That new disability rested not on any continuing criminal activity, but on a single crime committed years before IIRIRA's enactment. The antiretroactivity principle instructs against application of the new proscription to render Vartelas a first-time arrival at the country's gateway.

———————

address dangers that arise postenactment: sex offenders with a history of child molestation working in close proximity to children, and mentally unstable persons purchasing guns. The act of flying to Greece, in contrast, does not render a lawful permanent resident like Vartelas hazardous. Nor is it plausible that Congress' solution to the problem of dangerous lawful permanent residents would be to pass a law that would deter such persons from ever leaving the United States.

As for student loans, it is unlikely that the provision noted by the dissent, 20 U. S. C. §1091(r), would raise retroactivity questions in the first place. The statute has a prospective thrust. It concerns "[s]uspension of eligibility" when a student receiving a college loan commits a drug crime. The suspension runs "from the date of th[e] conviction" for specified periods, *e.g.*, two years for a second offense of possession. Moreover, eligibility may be restored before the period of ineligibility ends if the student establishes, under prescribed criteria, his rehabilitation.

IV

The Second Circuit homed in on the words "committed an offense" in §1101(a)(13)(C)(v) in determining that the change IIRIRA wrought had no retroactive effect. 620 F. 3d, at 119–121. It matters not that Vartelas may have relied on the prospect of continuing visits to Greece in deciding to plead guilty, the court reasoned. "[I]t would border on the absurd," the court observed, "to suggest that Vartelas committed his counterfeiting crime in reliance on the immigration laws." *Id.*, at 120. This reasoning is doubly flawed.

As the Government acknowledges, "th[is] Court has not required a party challenging the application of a statute to show [he relied on prior law] in structuring his conduct." Brief for Respondent 25–26. In *Landgraf*, for example, the issue was the retroactivity of compensatory and punitive damages as remedies for employment discrimination. "[C]oncerns of . . . upsetting expectations are attenuated in the case of intentional employment discrimination," the Court noted, for such discrimination "has been unlawful for more than a generation." 511 U. S., at 282, n. 35. But "[e]ven when the conduct in question is morally reprehensible or illegal," the Court added, "a degree of unfairness is inherent whenever the law imposes additional burdens based on conduct that occurred in the past." *Id.*, at 283, n. 35. And in *Hughes Aircraft*, the Court found that Congress' 1986 removal of a defense to a *qui tam* action did not apply to pre-1986 conduct in light of the presumption against retroactivity. 520 U. S., at 941–942.[8] As in *Land-*

---

[8] The deleted defense permitted *qui tam* defendants to escape liability if the information on which a private plaintiff (relator) relied was already in the Government's possession. Detrimental reliance was hardly apparent, for the Government, both before and after the statutory change, could bring suit with that information, and "the monetary liability faced by [a False Claims Act] defendant is the same whether the action is brought by the Government or by a *qui tam* relator." 520

*graf*, the relevant conduct (submitting a false claim) had been unlawful for decades. See 520 U. S., at 947.

The operative presumption, after all, is that Congress intends its laws to govern prospectively only. See *supra*, at 7. "It is a strange 'presumption,'" the Third Circuit commented, "that arises only on . . . a showing [of] actual reliance." *Ponnapula* v. *Ashcroft*, 373 F. 3d 480, 491 (2004). The essential inquiry, as stated in *Landgraf*, 511 U. S., at 269–270, is "whether the new provision attaches new legal consequences to events completed before its enactment." That is just what occurred here.

In any event, Vartelas likely relied on then-existing immigration law. While the presumption against retroactive application of statutes does not require a showing of detrimental reliance, see *Olatunji*, 387 F. 3d, at 389–395, reasonable reliance has been noted among the "familiar considerations" animating the presumption, see *Landgraf*, 511 U. S., at 270 (presumption reflects "familiar considerations of fair notice, reasonable reliance, and settled expectations"). Although not a necessary predicate for invoking the antiretroactivity principle, the likelihood of reliance on prior law strengthens the case for reading a newly enacted law prospectively. See *Olatunji*, 387 F. 3d, at 393 (discussing *St. Cyr*).

*St. Cyr* is illustrative. That case involved a lawful permanent resident who pleaded guilty to a criminal charge that made him deportable. Under the immigration law in effect when he was convicted, he would have been eligible to apply for a waiver of deportation. But his removal proceeding was commenced after Congress, in IIRIRA, withdrew that dispensation. Disallowance of discretionary waivers, the Court recognized, "attache[d] a new disability, in respect to transactions or considerations already past." 533 U. S., at 321 (internal quotation marks omit-

————————

U. S., at 948.

ted).   Aliens like St. Cyr, the Court observed, "almost
certainly relied upon th[e] likelihood [of receiving discre-
tionary relief] in deciding [to plead guilty, thereby] for-
go[ing] their right to a trial."  *Id*., at 325.[9]  Hence, applying
the IIRIRA withdrawal to St. Cyr would have an "obvious
and severe retroactive effect."  *Ibid*.  Because Congress
made no such intention plain, *ibid.*, n. 55, we held that the
prior law, permitting relief from deportation, governed St.
Cyr's case.

   As to retroactivity, one might think Vartelas' case even
easier than St. Cyr's.  St. Cyr could seek the Attorney
General's *discretionary* dispensation.  Vartelas, under
*Fleuti*, was free, without seeking an official's permission,
to make trips of short duration to see and assist his par-
ents in Greece.[10]  The Second Circuit thought otherwise,
compounding its initial misperception (treating reliance as
essential to application of the antiretroactivity principle).
The deportation provision involved in *St. Cyr*, 8 U. S. C.
§1229b(a)(3), referred to the alien's "convict[ion]" of a
crime, while the statutory words *sub judice* in Vartelas'
case were "committed an offense."  §1101(a)(13)(C)(v); see
*supra*, at 12–13.[11]  The practical difference, so far as retro-

––––––––––

   [9] "There can be little doubt," the Court noted in *St. Cyr*, "that, as
a general matter, alien defendants considering whether to enter into a
plea agreement are acutely aware of the immigration consequences of
their convictions."  533 U. S., at 322.  Indeed, "[p]reserving [their] right
to remain in the United States may be more important to [them] than
any potential jail sentence."  *Ibid*. (internal quotation marks omitted).
See *Padilla* v. *Kentucky*, 559 U. S. ___, ___ (2010) (slip op., at 9–11)
(holding that counsel has a duty under the Sixth Amendment to inform
a noncitizen defendant that his plea would make him eligible for
deportation).

   [10] Armed with knowledge that a guilty plea would preclude travel
abroad, aliens like Vartelas might endeavor to negotiate a plea to a
nonexcludable offense—in Vartelas' case, *e.g.*, possession of counterfeit
securities—or exercise a right to trial.

   [11] After the words "committed an offense," §1101(a)(13)(C)(v)'s next
words are "identified in section 1182(a)(2)."  That section refers to "any

activity is concerned, escapes from our grasp. Ordinarily, to determine whether there is clear and convincing evidence that an alien has committed a qualifying crime, the immigration officer at the border would check the alien's records for a conviction. He would not call into session a piepowder court[12] to entertain a plea or conduct a trial.

Satisfied that Vartelas' case is at least as clear as St. Cyr's for declining to apply a new law retroactively, we hold that *Fleuti* continues to govern Vartelas' short-term travel.

\*    \*    \*

For the reasons stated, the judgment of the Court of Appeals for the Second Circuit is reversed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

———————

alien *convicted of*, or who admits having committed," *inter alia*, "a crime involving moral turpitude." §1182(a)(2)(A)(i)(I) (emphasis added). The entire §1101(a)(13)(C)(v) phrase "committed an offense identified in section 1182(a)(2)," on straightforward reading, appears to advert to a lawful permanent resident who has been convicted of an offense under §1182(a)(2) (or admits to one).

[12] Piepowder ("dusty feet") courts were temporary mercantile courts held at trade fairs in Medieval Europe; local merchants and guild members would assemble to hear commercial disputes. These courts provided fast and informal resolution of trade conflicts, settling cases "while the merchants' feet were still dusty." Callahan, Medieval Church Norms and Fiduciary Duties in Partnership, 26 Cardozo L. Rev. 215, 235, and n. 99 (2004) (internal quotation marks omitted) (quoting H. Berman, Law and Revolution: The Formation of the Western Legal Tradition 347 (1983)).

# SUPREME COURT OF THE UNITED STATES

No. 10–1211

PANAGIS VARTELAS, PETITIONER *v.* ERIC H.
HOLDER, JR., ATTORNEY GENERAL

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE SECOND CIRCUIT

[March 28, 2012]

JUSTICE SCALIA, with whom JUSTICE THOMAS and
JUSTICE ALITO join, dissenting.

As part of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA), Congress required that lawful permanent residents who have committed certain crimes seek formal "admission" when they return to the United States from abroad.  8 U. S. C. §1101(a)(13)(C)(v).  This case presents a straightforward question of statutory interpretation: Does that statute apply to lawful permanent residents who, like Vartelas, committed one of the specified offenses before 1996, but traveled abroad after 1996?  Under the proper approach to determining a statute's temporal application, the answer is yes.

I

The text of §1101(a)(13)(C)(v) does not contain a clear statement answering the question presented here.  So the Court is correct that this case is governed by our longstanding interpretive principle that, in the absence of a contrary indication, a statute will not be construed to have retroactive application.  See, *e.g., Landgraf* v. *USI Film Products*, 511 U. S. 244, 280 (1994).  The operative provision of this text—the provision that specifies the act that it prohibits or prescribes—says that lawful perma-

nent residents convicted of offenses similar to Vartelas's must seek formal "admission" before they return to the United States from abroad. Since Vartelas returned to the United States after the statute's effective date, the application of that text to his reentry does not give the statute a retroactive effect.

In determining whether a statute applies retroactively, we should concern ourselves with the statute's actual operation on regulated parties, not with retroactivity as an abstract concept or as a substitute for fairness concerns. It is impossible to decide whether a statute's application is retrospective or prospective without first identifying a reference point—a moment in time to which the statute's effective date is either subsequent or antecedent. (Otherwise, the obvious question—retroactive in reference to what?—remains unanswered.) In my view, the identity of that reference point turns on the activity a statute is intended to regulate. For any given regulated party, the reference point (or "retroactivity event") is the moment at which the party does what the statute forbids or fails to do what it requires. See *Martin* v. *Hadix*, 527 U. S. 343, 362–363 (1999) (SCALIA, J., concurring in part and concurring in judgment); *Landgraf, supra,* at 291 (SCALIA, J., concurring in judgments). With an identified reference point, the retroactivity analysis is simple. If a person has engaged in the primary regulated activity *before* the statute's effective date, then the statute's application *would* be retroactive. But if a person engages in the primary regulated activity *after* the statute's effective date, then the statute's application is prospective only. In the latter case, the interpretive presumption against retroactivity does not bar the statute's application.

Under that commonsense approach, this is a relatively easy case. Although the *class* of aliens affected by §1101(a)(13)(C)(v) is defined with respect to past crimes, the *regulated activity* is reentry into the United States. By

its terms, the statute is all about controlling admission at
the border. It specifies six criteria to identify lawful per-
manent residents who are subject to formal "admission"
procedures, most of which relate to the circumstances of
departure, the trip itself, or reentry. The titles of the
statutory sections containing §1101(a)(13)(C)(v) confirm
its focus on admission, rather than crime: The provision is
located within Title III of IIRIRA ("Inspection, Apprehen-
sion, Detention, Adjudication, and Removal of Inadmissi-
ble and Deportable Aliens"), under Subtitle A ("Revision of
Procedures for Removal of Aliens"), and §301 ("Treating
Persons Present in the United States Without Authori-
zation as Not Admitted"). 110 Stat. 3009–575. And the
specific subsection of IIRIRA at issue (§301(a), entitled
"'Admission' Defined") is an amendment to the definition
of "entry" in the general "Definitions" section of the Immi-
gration and Nationality Act (INA). See *ante,* at 2–3. The
original provision told border officials how to regulate
admission—not how to punish crime—and the amendment
does as well.

   Section 1101(a)(13)(C)(v) thus has no retroactive effect
on Vartelas because the reference point here—Vartelas's
readmission to the United States after a trip abroad—
occurred years after the statute's effective date. Although
Vartelas cannot change the fact of his prior conviction, he
could have avoided *entirely* the consequences of
§1101(a)(13)(C)(v) by simply remaining in the United
States or, having left, remaining in Greece. That
§1101(a)(13)(C)(v) had no effect on Vartelas until he per-
formed a post-enactment activity is a clear indication
that the statute's application is purely prospective. See
*Fernandez-Vargas* v. *Gonzales,* 548 U. S. 30, 45, n. 11,
46 (2006) (no retroactive effect where the statute in
question did "not operate on a completed preenactment
act" and instead turned on "a failure to take timely action
that would have avoided application of the new law

altogether").

## II

The Court avoids this conclusion by insisting that "[p]ast misconduct, . . . not present travel, is the wrongful activity Congress targeted" in §1101(a)(13)(C)(v). *Ante,* at 11. That assertion does not, however, have any basis in the statute's text or structure, and the Court does not pretend otherwise. Instead, the Court simply asserts that Vartelas's "lawful foreign travel" surely could not be the "reason for the 'new disability' imposed on him." *Ibid.* (emphasis added). But the *reason* for a prohibition has nothing to do with whether the prohibition is being applied to a past rather than a future act. It may be relevant to other legal inquiries—for example, to whether a legislative act violates one of the *Ex Post Facto* Clauses in Article I, see, *e.g., Smith* v. *Doe*, 538 U. S. 84, 92 (2003), or one of the Due Process Clauses in the Fifth and Fourteenth Amendments, see, *e.g., Williamson* v. *Lee Optical of Okla., Inc.*, 348 U. S. 483, 487 (1955), or the Takings Clause in the Fifth Amendment, see, *e.g., Kelo* v. *New London*, 545 U. S. 469, 477–483 (2005), or the Obligation of Contracts Clause in Article I, see, *e.g., United States Trust Co. of N. Y.* v. *New Jersey*, 431 U. S. 1, 29 (1977). But it has no direct bearing upon whether the statute is retroactive.*

The Court's failure to differentiate between the statutory-interpretation question (whether giving certain effect to a provision would make it retroactive and hence presump-

————————

*I say no *direct* bearing because if the prospective application of a statute would raise constitutional doubts because of its effect on pre-enactment conduct, *that* would be a reason to presume a legislative intent not to apply it unless the conduct in question is post-enactment—that is, to consider it retroactive when the conduct in question is pre-enactment. See *Clark* v. *Martinez*, 543 U. S. 371, 380–381 (2005). That is not an issue here. If the statute had expressly made the new "admission" rule applicable to those aliens with prior convictions, its constitutionality would not be in doubt.

tively unintended) and the validity question (whether giving certain effect to a provision is unlawful) is on full display in its attempts to distinguish §1101(a)(13)(C)(v) from similar statutes. Take, for example, the Court's discussion of the Racketeer Influenced and Corrupt Organizations Act (RICO). That Act, which targets "patterns of racketeering," *expressly* defines those "patterns" to include some pre-enactment conduct. See 18 U. S. C. §1961(5). Courts interpreting RICO therefore need not consider the presumption against retroactivity; instead, the cases cited by the majority consider whether RICO violates the *Ex Post Facto* Clause. See *United States* v. *Brown*, 555 F. 2d 407, 416–417 (CA5 1977); *United States* v. *Campanale*, 518 F. 2d 352, 364–365 (CA9 1975) *(per curiam)*. The Government recognized this distinction and cited RICO to make a point about the *Ex Post Facto* Clause rather than the presumption against retroactivity, Brief for Respondent 17–18; the Court evidently does not.

The Court's confident assertion that Congress surely would not have meant this statute to apply to Vartelas, whose foreign travel and subsequent return to the United States were innocent events, *ante,* at 11, 14, simply begs the question presented in this case. Ignorance, of course, is no excuse *(ignorantia legis neminem excusat);* and his return was entirely lawful only if the statute before us did not render it unlawful. Since IIRIRA's effective date in 1996, lawful permanent residents who have committed crimes of moral turpitude are forbidden to leave the United States and return without formally seeking "admission." See §1101(a)(13)(C)(v). As a result, Vartelas's numerous trips abroad and "uneventful" reentries into the United States after the passage of IIRIRA, see *ante,* at 5, were lawful only *if* §1101(a)(13)(C)(v) does not apply to him—which is, of course, precisely the matter in dispute here.

The Court's circular reasoning betrays its underlying

concern: Because the Court believes that reentry after a
brief trip abroad *should* be lawful, it will decline to apply a
statute that clearly provides otherwise for certain criminal
aliens.   (The same instinct likely produced the Court's
questionable statutory interpretation in *Rosenberg* v.
*Fleuti*, 374 U. S. 449 (1963).)  The Court's test for retroac-
tivity—asking whether the statute creates a "new disabil-
ity" in "respect to past events"—invites this focus on fair-
ness.  Understandably so, since it is derived from a Justice
Story opinion interpreting a provision of the New Hamp-
shire Constitution that *forbade* retroactive laws—a provi-
sion comparable to the Federal Constitution's *ex post facto*
prohibition and bearing no relation to the presumption
against retroactivity.  What is unfair or irrational (and
hence should be forbidden) has nothing to do with whether
applying a statute to a particular act is prospective (and
thus presumptively intended) or retroactive (and thus
presumptively unintended).  On the latter question, the
"new disability in respect to past events" test provides no
meaningful guidance.

I can imagine countless laws that, like §1101(a)(13)
(C)(v), impose "new disabilities" related to "past events"
and yet do not operate retroactively.  For example, a stat-
ute making persons convicted of drug crimes ineligible for
student loans.  See, *e.g.,* 20 U. S. C. §1091(r)(1).  Or laws
prohibiting those convicted of sex crimes from working in
certain jobs that involve repeated contact with minors.
See, *e.g.,* Cal. Penal Code Ann. §290.95(c) (West Supp.
2012).  Or laws prohibiting those previously committed
for mental instability from purchasing guns.  See, *e.g.,* 18
U. S. C. §922(g)(4).  The Court concedes that it would not
consider the last two laws inapplicable to pre-enactment
convictions or commitments.  *Ante,* at 12, n. 7.  The Court
does not deny that these statutes impose a "new disability
in respect to past events," but it distinguishes them based
on the *reason* for their enactment: These statutes "address

dangers that arise postenactment." *Ante,* at 13, n. 7. So much for the new-disability-in-respect-to-past-events test; it has now become a new-disability-not-designed-to-guard-against-future-danger test. But why is guarding against future danger the *only* reason Congress may wish to regulate future action in light of past events? It obviously is not. So the Court must invent yet another doctrine to address my first example, the law making persons convicted of drug crimes ineligible for student loans. According to the Court, that statute differs from §1101(a)(13)(C)(v) because it "has a prospective thrust." *Ante,* at 13, n. 7. I cannot imagine what that means, other than that the statute regulates post-enactment conduct. But, of course, so does §1101(a)(13)(C)(v). Rather than reconciling any of these distinctions with Justice Story's formulation of retroactivity, the Court leaves to lower courts the unenviable task of identifying new-disabilities‑not‑designed‑to‑guard‑against‑future‑danger-and-also-lacking-a-prospective-thrust.

And anyway, is there any doubt that §1101(a)(13)(C)(v) is intended to guard against the "dangers that arise postenactment" from having aliens in our midst who have shown themselves to have proclivity for crime? Must that be rejected as its purpose simply because Congress has not sought to achieve it by all possible means—by ferreting out such dangerous aliens and going through the expensive and lengthy process of deporting them? At least some of the post-enactment danger can readily be eliminated by forcing lawful permanent residents who have committed certain crimes to undergo formal "admission" procedures at our borders. Indeed, by limiting criminal aliens' opportunities to travel and then return to the United States, §1101(a)(13)(C)(v) may encourage self-deportation. But all this is irrelevant. The positing of legislative "purpose" is always a slippery enterprise compared to the simple determination of whether a statute regulates a future

event—and it is that, rather than the Court's pronounce-ment of some forward-looking *reason*, which governs whether a statute has retroactive effect.

Finally, I cannot avoid observing that even if the Court's concern about the fairness or rationality of applying §1101(a)(13)(C)(v) to Vartelas were relevant to the statu-tory interpretation question, that concern is greatly exag-gerated. In disregard of a federal statute, convicted crimi-nal Vartelas repeatedly traveled to and from Greece without ever seeking formal admission at this country's borders. When he was finally unlucky enough to be ap-prehended, and sought discretionary relief from removal under former §212(c) of the INA, 8 U. S. C. §1182(c) (1994 ed.), the Immigration Judge denying his application found that Vartelas had made frequent trips to Greece and had remained there for long periods of time, that he was "a serious tax evader," that he had offered testimony that was "close to incredible," and that he had not shown hard-ship to himself or his estranged wife and children should he be removed. See 620 F. 3d 108, 111 (CA2 2010); Brief for Respondent 5 (internal quotation marks omitted). In decrying the "harsh penalty" imposed by this statute on Vartelas, the Court ignores those inconvenient facts. *Ante*, at 9. But never mind. Under any sensible approach to the presumption against retroactivity, these factual subtleties should be irrelevant to the temporal application of §1101(a)(13)(C)(v).

*        *        *

This case raises a plain-vanilla question of statutory interpretation, not broader questions about frustrated expectations or fairness. Our approach to answering that question should be similarly straightforward: We should determine what relevant activity the statute regulates (here, reentry); absent a clear statement otherwise, only such relevant activity which occurs after the statute's

effective date should be covered (here, post-1996 re-entries).  If, as so construed, the statute is unfair or irrational enough to violate the Constitution, that is another matter entirely, and one not presented here.  Our interpretive presumption against retroactivity, however, is just that—a tool to ascertain what the statute means, not a license to rewrite the statute in a way the Court considers more desirable.

I respectfully dissent.